294 N.J. Super. 407 (1996)
683 A.2d 595
RAMON CLASS, PLAINTIFF,
v.
AMERICAN ROLLER DIE CORP., T/A ARDCORE, AN OHIO CORPORATION; LEE WILSON ENGINEERING COMPANY, INC., AN OHIO CORPORATION; B & K MACHINERY INTERNATIONAL LIMITED, A FOREIGN CORPORATION; P & F INDUSTRIES, A FOREIGN CORPORATION; COMPANY(S) 4-6, DESIGNERS AND/OR MANUFACTURERS OF PRESSES; MECHANICAL STEEL TUBING CORP.; COMPANY(S) 8-10, DISTRIBUTORS OF PRESSES MANUFACTURED BY AMERICAN ROLLER DIE CORP., T/A ARDCORE, LEE WILSON ENGINEERING COMPANY, INC., B & K MACHINERY INTERNATIONAL LIMITED, AND P & F INDUSTRIES AND COMPANY(S) 4-6; BILL KNATH MACHINERY COMPANY; COMPANY(S) 11-13, MAINTENANCE COMPANIES OF STRUT MILL CUT-OFF PRESSES; SUTTER MANUFACTURING TOOL & DIE CO., DIVISION OF MJM TOOLING CORP., MANUFACTURER OF DIES TO BE USED IN CONJUNCTION WITH THE STRUT MILL CUT-OFF PRESS MANUFACTURED AND DESIGNED BY AMERICAN ROLLER DIE CORP., T/A ARDCORE, LEE WILSON ENGINEERING COMPANY, INC., B & K MACHINERY INTERNATIONAL LIMITED, P & F INDUSTRIES AND COMPANY(S) 4-6; BC COMPANY(S), MANUFACTURERS OF VARIOUS COMPONENT PARTS TO THE STRUT MILL CUT-OFF PRESS MANUFACTURED AND DESIGNED BY AMERICAN ROLLER DIE CORP., T/A ARDCORE, LEE WILSON ENGINEERING COMPANY, INC., B & K MACHINERY INTERNATIONAL LIMITED, P & F INDUSTRIES AND COMPANY(S) 4-6, XYZ COMPANY(S), DISTRIBUTORS OF VARIOUS COMPONENT PARTS AND/OR NECESSARY PARTS TO STRUT MILL CUT-OFF PRESSES; HAYDON CORPORATION, DEFENDANTS.
Superior Court of New Jersey, Law Division Passaic County.
Decided June 12, 1996.
*412 William C. Carey (McElroy, Deutsch & Mulvaney) for defendant Lee Wilson Engineering Company, Inc.
Thomas M. O'Hara (Clemente, Gesicki & O'Hara) for defendant P & F Industries
Steven J. Tegrar, Esquire (Stevens & Minter) for defendant American Roller Die Corp.
MINIMAN, J.S.C.
The parties to this action entered into an agreement with Plaintiff Ramon Class (Class) pursuant to which three defendants paid Class a total of $875,000. Pursuant to that agreement, the defendants remaining in this action when plaintiff's claims were settled retained their right to a judicial determination of their liability as alleged seriatim successors to the original manufacturer whose product injured plaintiff, as well as their rights and obligations inter sese under various asset purchase agreements and otherwise. Because the facts relevant to liability are undisputed, defendants seek a determination of these issues prior to the presentation of any evidence relating to damages for breach of any asset purchase agreement. The court finds that based on their status seriatim product-line successors have a right inter sese to *413 common law indemnification, pursuant to which the burden of responding in damages to an injured consumer is to be borne equally.
On November 10, 1988, Class was injured while working at Haydon Corporation (Haydon) on a punch press manufactured in 1954, by American Roller Die Corporation (Ardcor). Ardcor no longer existed at the time of plaintiff's accident, having sold all of its assets of every kind and description to defendant Lee Wilson Engineering Company, Inc. (Wilson) on April 1, 1963, except for certain listed assets not relevant here. Ardcor went out of business shortly thereafter. Wilson agreed to pay $684,814.64 for the transferred assets  $247,999 for machinery, equipment, airplane, furniture, fixtures and other depreciable property; $411,814.68 for inventory; $15,000 for patents; and $10,000 for good will, trademarks, trade names, brands, labels, copyrights and the exclusive right to use the Ardcor name. The purchase price was paid in part pursuant to § 3.1 by the assumption of all trade accounts payable and other obligations, including salaries, wages, commissions, bonuses and vacation or holiday pay, all as specifically shown on Exhibit A to the Purchase Agreement, and the balance in cash pursuant to § 3.2. In addition, Wilson agreed in § 4 to assume certain other obligations, including performance of all Ardcor contractual obligations not rendered prior to April 1, 1963.
Ardcor and Wilson addressed risk spreading and cost avoidance in the Purchase Agreement. In § 3.1 they provided:
It is expressly agreed that all liabilities not specifically referred to in this Section 3.1 or in Section 4 shall not be assumed by Wilson but shall be paid by Ardcor. Ardcor agrees to indemnify Wilson and save it harmless from any and all claims asserted against Wilson or any of the assets purchased hereunder by reason of any such liabilities to be paid by Ardcor....
After the closing Wilson continued the production of the Ardcor product line. In October 1968, Wilson sold its Ardcor and Seco *414 Divisions to defendant P & F Industries, Inc. (P & F).[1] Pursuant to the October 1968 purchase agreement, P & F acquired the remaining assets of the Ardcor and Seco Divisions of Wilson, including inventory and tube mills located at the Ardcor plant, jigs, fixtures, patterns, engineering drawings, bills of material and files related to the Ardcor and Seco product lines, patents and patent applications relating thereto, and the Ardcor and Seco trade names. The purchase price was $412,500 payable by certified check. Wilson agreed not to compete with the Ardcor or Seco product lines for a period of five years.
The parties to this agreement, too, addressed risk spreading and cost allocation, providing in § 12 as follows:
It is understood and agreed that the total purchase price to be paid by [P & F] hereunder is the amount stated in Section 2 hereof, and that [P & F] assumes no liability or obligation whatsoever of Seller including service and warranty obligations with respect to products of the Ardcor and Seco Product Lines heretofore sold by [Wilson] or B & K Machinery International Limited.
Thus, Wilson clearly and unequivocally agreed that all liabilities and obligations of Wilson remained with it and were not assumed by P & F, including the contractual obligations of Ardcor which Wilson assumed on April 1, 1963, as well as those Wilson and B & K incurred thereafter. In addition, Wilson in § 6 agreed to indemnify and hold P & F harmless from any damage or loss, including reasonable attorneys fees, which P & F sustained as a result of any breach of any covenant contained in the October 1968 agreement.
After the transfer of the Ardcor and Seco assets from Wilson to P & F, Wilson continued to service previously-sold Ardcor and Seco products and to manufacture other product lines. Wilson remained in business when Class was injured in 1988, at which *415 time it had a one million dollar indemnity policy covering product defects. Furthermore, Wilson was extant when a lawsuit was begun in 1990 by Haydon in its own name as employer to recover, inter alia, the worker's compensation benefits paid to Class[2] and was also extant when this lawsuit was begun. It remained extant until 1994, when it dissolved, having stopped manufacturing in 1993.
P & F never operated the Ardcor and Seco businesses, merely warehousing the Ardcor assets until they were resold fourteen months later. On January 14, 1970, P & F sold everything it purchased from Wilson to American Roll Tooling, Inc. (American), including the Ardcor product line. The assets sold were described as all inventory relating to the Ardcor roll form business, including two small open-seam tube mills (but excluding two electric-welded tube mills and welders), drawings and engineering files, the names of Ardor and American Roller Die Corporation, the good will pertaining thereto, and designated patents and patent applications, as well as the assets relating to the Seco product line. The purchase price was $115,000. P & F agreed not to use the names Ardcor or American Roller Die Corporation, and agreed to cooperate with American in securing the telephone numbers for the original manufacturer. No liabilities were assumed. The agreement was silent with respect to allocation of risk except in § 9E which required American to secure "[a]n insurance certificate complying with the provisions under Paragraph 11 of Exhibit B-1 which shall contain a provision, if obtainable, naming P & F as an *416 additional insured.[3]" American has operated the Ardcor business from its acquisition to the time of the settlement of plaintiff's claim, employing at least one Ardcor worker who was employed by Wilson but not by P & F. It was manufacturing the Ardcor product line on the date of the accident in which Class was injured and at the time the Haydon and Class lawsuits were filed.
To resolve the failure-to-warn claims of Class, American paid Class $125,000  an amount which is not subject to reallocation under this opinion. In addition, Wilson, P & F, and American stipulated damages from product defects at $750,000 and agreed to pay those damages equally to satisfy the strict product liability claims pending this court's determination of each defendant's liability to Class and inter sese. These damages were sufficient to satisfy the workers' compensation lien and to provide Class with additional compensation. This court must now determine whether each of the defendants was liable to Class as a successor corporation or otherwise, whether the right of Class to recover damages from any defendant was limited in any way, and what contractual, common law or statutory rights the successors have here inter sese to reallocation of the stipulated damages for the strict product liability claims.

Traditional Successor Liability Rule
The leading New Jersey case discussing the traditional rule governing successor liability is McKee v. Harris-Seybold Co., 109 N.J. Super. 555, 264 A.2d 98 (Law Div. 1970), aff'd, 118 N.J. Super. 480, 288 A.2d 585 (App.Div. 1972). In that case, the court identified four commonly found exceptions to the general rule that a transferee of assets is not liable for the debts and liabilities of the transferor. Those exceptions are (a) an express or implied assumption of liabilities, (b) a consolidation or merger of two corporations, (c) the mere continuation of the seller in the form of *417 the purchaser, or (d) the transfer of the assets to avoid liability for the seller's debts. Id. at 561, 264 A.2d 98. In addition, the McKee court acknowledged a fifth exception where there was an absence of adequate consideration for the sale or transfer of assets. Ibid.
It would seem from the Ardcor/Wilson contract that Wilson expressly and impliedly assumed certain obligations of Ardcor. When Wilson entered into the asset purchase agreement with Ardcor, it specifically agreed in § 4 that it would perform all Ardcor contractual obligations not rendered prior to April 1, 1963. Arguably, the obligation to respond to claims for breaches of warranty respecting goods sold prior to April 1, 1963, was a contractual obligation of Ardcor under the warranties implied by the Uniform Commercial Code into contracts for the sale of goods. Thus, Wilson in § 4 of the Ardcor/Wilson agreement may have intended to assume and perform all of Ardcor's warranty obligations which were not rendered prior to April 1, 1963.
The parties to a contract are presumed to have drafted the contract in accordance with the law extant at the time of the making of the contract. Silverstein v. Keane, 19 N.J. 1, 13, 115 A.2d 1 (1955). It is proper to determine the unexpressed implications of what is written in the contract by reference to such law. Deerhurst Estates v. Meadow Homes, Inc., 64 N.J. Super. 134, 152, 165 A.2d 543 (App.Div. 1960), certif. den., 34 N.J. 66, 167 A.2d 55 (1961). At the time the Ardcor/Wilson agreement was executed, manufacturers, even in the absence of privity, were held liable in New Jersey to injured consumers under the U.C.C. warranties of fitness and merchantability implied into contracts for the sale of goods. Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 379, 384, 161 A.2d 69 (1960). Responding in damages to Class, a consumer injured on and after April 1, 1963, for a breach of warranty causing injury may properly be considered an "Ardcor contractual obligation not rendered prior to April 1, 1963," and thus within the terms of the Ardcor/Wilson agreement and the contemplation of the parties. As a consequence, liability for *418 defects in products may very well have been an obligation of Ardcor expressly assumed by Wilson in the purchase agreement.
Absent such an express assumption of Ardcor liabilities by Wilson, Class would be without a remedy under the McKee analysis of successor liability. P & F did not expressly or impliedly assume any obligations of Wilson or Ardcor. While Wilson was manufacturing the Ardcor products, the New Jersey Supreme Court characterized product liability as "hybrid, having its commencement in contract and its termination in tort." Santor v. A & M Karagheusian, Inc., 44 N.J. 52, 64, 207 A.2d 305 (1965) (holding that the concepts underlying product liability "bespeak a sui generis cause of action"). Thus, at the time the Wilson/P & F contract was executed, product liability was still, to some extent, rooted in contract warranties. The parties to that contract expressly agreed that P & F "assume[d] no liability or obligation whatsoever" of Wilson, including service and warranty obligations with respect to Ardcor products sold by Wilson or B & K.[4] Thus, under the assumption-of-liabilities exception to the traditional successor liability rule, P & F would not be liable to Class. In addition, American would not be liable to Class under the same exception because no liabilities were expressly or impliedly assumed by American in the P & F/American agreement.[5] We need not, however, decide whether Wilson is liable under the McKee rule, because such analysis has been abandoned in New Jersey in products liability cases, which are governed by the theory of product-line successor liability.

*419 The Development of Product-Line Successor Liability

The concept of product-line successor liability was first developed in Ray v. Alad Corp., 19 Cal.3d 22, 136 Cal. Rptr. 574, 560 P.2d 3 (1977). In that case plaintiff Ray was injured when he fell from a defective ladder manufactured by Alad Corporation (Alad I). Prior to plaintiff's accident Alad I sold its stock in trade, fixtures, equipment, trade name, inventory and good will to Lighting Maintenance Corporation (Lighting), agreed to dissolve, and agreed to assist Lighting in forming a new corporation under the name of Alad Corporation. Liabilities, except for work in progress and material ordered but not delivered, were not assumed by Lighting. Lighting thereupon formed Stern Ladder Company, which changed its name to Alad Corporation (Alad II) and exchanged all of its outstanding stock for the Alad I assets held by Lighting.
The California Supreme Court discussed the four traditional exceptions to the general rule that a purchaser does not assume the seller's liabilities. Ray, supra, 136 Cal. Rptr. at 576, 560 P.2d at 5. Because strict product liability promotes the policy of protecting otherwise defenseless victims of manufacturing defects by spreading the cost of compensating them throughout society, the Court determined that liability should instead be imposed upon a showing of:
(1) the virtual destruction of the plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business, (2) the successor's ability to assume the original manufacturer's risk-spreading rule [sic], and (3) the fairness of requiring the successor to assume a responsibility for defective products that was a burden necessarily attached to the original manufacturer's good will being enjoyed by the successor in the continued operation of the business.
[Id. at 579-580, 560 P.2d at 8-9.]
Because the manufacturing assets of Alad I had been acquired by Lighting for the benefit of Alad II and the remaining Alad I assets had already been distributed to its stockholders before plaintiff was injured, the Court found the first criterion satisfied. This was so because plaintiff would face "formidable and probably insuperable obstacles" in attempting to collect a judgment from *420 former stockholders and directors, especially where products liability insurance, generally written on an occurrence basis, of a defunct company was not a likely source of compensation to injured parties. Ray, supra, 136 Cal. Rptr. at 580, 560 P.2d at 9.
The Court also found that Alad II had secured the name and operating assets that had previously been available for meeting its responsibilities to injured persons. This gave Alad II "virtually the same capacity as Alad I to estimate the risks of claims for injuries from defects in previously manufactured ladders for purposes of obtaining insurance coverage or planning self-insurance." Ray, supra, 136 Cal. Rptr. at 581, 560 P.2d at 10.
Finally, the Court held that imposing liability on Alad II was fair and equitable because Alad II acquired the trade name, good will and customer lists of Alad I, continued to produce the product line, and held itself out as the same enterprise. Ray, supra, 136 Cal. Rptr. at 581, 560 P.2d at 10. In conclusion, the Court justified imposing liability upon successor manufacturers because it caused the one who took the benefit of a product line and its good will to bear the burden of responsibility for defective products in that product line. Ray, supra, 136 Cal. Rptr. at 581-82, 560 P.2d at 10-11. It also precluded the original manufacturer from securing an enhanced asset purchase price predicated on the absence of successor liability, which price it could distribute to shareholders in avoidance of its responsibility to persons injured by defective products. Id. at 582, 560 P.2d at 11.
New Jersey followed California's lead four years later. Ramirez v. Amsted Indus., Inc., 86 N.J. 332, 431 A.2d 811 (1981); Nieves v. Bruno Sherman Corp., 86 N.J. 361, 431 A.2d 826 (1981). In Ramirez, as here, the plaintiff was injured while operating an allegedly defective power press at his employer's place of business. Ramirez, supra, 86 N.J. at 335, 431 A.2d 811. The press was manufactured by Johnson Machine and Press Company (Johnson) in 1948, or 1949. Ibid. Again as here, the manufacturing assets of Johnson passed through several successors. In 1956 Johnson transferred all of its assets and liabilities, including one *421 share of Johnson common stock, to Bontrager Construction Company (Bontrager) which continued the manufacture of the Johnson press line. Id. at 337-38, 431 A.2d 811.
In 1962 Amsted Industries, Inc. (Amsted), acquired all the assets of Bontrager, including the assets and stock of Johnson for cash. Ramirez, supra, 86 N.J. at 338, 431 A.2d 811. Included in the transfer was the right to use the Johnson trade name and the services of Bontrager's employees. Ibid. Amsted assumed certain specified debts and liabilities and excluded those not expressly assumed. Ibid. Bontrager agreed to remain solely responsible for all its other known or unknown liabilities, debts and obligations, including costs in excess of $50 to repair defects in previously sold equipment which Amsted was called upon to repair. Id. at 339, 431 A.2d 811. Amsted expressly declined to assume liability for claims arising out of defects in products manufactured by its predecessors. Id. at 338 n. 2, 431 A.2d 811. Nonetheless, Bontrager shortly thereafter distributed the cash to its stockholders and dissolved its inert corporate existence. Ibid. Thus, injured persons had little or no effective recourse against Bontrager thirteen years later.
Following the 1962 acquisition, Amsted manufactured the Johnson press line through a wholly owned subsidiary, South Bend Lathe, Inc. (South Bend I). Ramirez, supra, 86 N.J. at 339, 431 A.2d 811. The assets assigned to South Bend I included the one share of Johnson common stock. Ibid. Amsted's officers served as the officers and directors of the Johnson corporate shell until it was dissolved in July of 1965. Ibid. In September 1965, South Bend I was dissolved and its assets and liabilities were assumed by Amsted, which continued to manufacture the Johnson press line. Ibid.
In June of 1975, the Johnson product line assets were sold to the newly formed South Bend Lathe, Inc. (South Bend II). Ramirez, supra, 86 N.J. at 339, 431 A.2d 811. Amsted agreed to indemnify South Bend II for any losses arising out of previously manufactured and sold machinery. On appeal, Amsted acknowledged *422 "that by virtue of this indemnity agreement, it is responsible for the defense against and payment of any liability claims against South Bend II arising out of any defects in the Johnson product line." Id. at 340, 431 A.2d 811. Two months after this transfer to South Bend II, plaintiff was injured but apparently did not join South Bend II as a party to the action.
The Court reviewed the McKee case as well as sister-state law governing corporate successor liability. Ramirez, supra, 86 N.J. at 340-343, 431 A.2d 811. First, the Supreme Court identified the same four exceptions to the general rule that a transferee of assets is not liable for the debts and liabilities of the transferor, which were noted by the California Supreme Court in Ray v. Alad. Id. at 340-41, 431 A.2d 811. In addition, the Ramirez Court noted that McKee imposed a fifth exception where there was an absence of adequate consideration for the sale or transfer of assets. Id. at 342, 431 A.2d 811. Opining on the vagaries of the traditional successor liability rule in New Jersey and elsewhere, the New Jersey Supreme Court found that the traditional rule was "inconsistent with the developing principles of strict products liability and unresponsive to the interests of persons injured by defective products in the stream of commerce." Ibid.
Next, the court considered decisions which have broadened the exceptions to nonliability for a "de facto merger" and a "mere continuation" in the context of the developing law of strict products liability. Ramirez, supra, 86 N.J. at 343-348, 431 A.2d 811. One such decision, Turner v. Bituminous Cas. Co., 397 Mich. 406, 244 N.W.2d 873 (1976), eliminated the requirement of a stock transfer, imposing liability where assets were transferred for cash if other factors established a sufficient nexus for successor liability, emphasizing continuity of the enterprise rather than shareholders. Ramirez, supra, 86 N.J. at 345, 431 A.2d 811. Although the Court acknowledged that the Turner analysis  which focused on ownership and management of the successor entity, its personnel and assets  would allow Ramirez to recover on the facts before the Court, it rejected Turner's expanded "mere continuation" *423 exception in favor of the product-line approach of Ray v. Alad. The Court observed that Ray completely abandoned the traditional rule and its exceptions. Ramirez, supra, 86 N.J. at 347, 431 A.2d 811. Emphasizing that Ray was not concerned with "the continuation of the corporate entity as such but rather with the successor's undertaking to manufacture essentially the same line of products as the predecessor," the Court determined "that the focus in cases involving corporate successor liability for injuries caused by defective products should be on the successor's continuation of the actual manufacturing operation and not on commonality of ownership and management between the predecessor's and successor's corporate entities...." Ibid.
In finding Amsted liable, the Supreme Court specifically discussed each of the three criteria enunciated in Ray v. Alad. The Court noted that the first criterion  the virtual destruction of the plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business  was satisfied by the purchase of the Johnson assets, trade name and good will as well as by the resulting dissolution of Johnson. Ramirez, supra, 86 N.J. at 349-50, 431 A.2d 811. Acknowledging the intermediate transaction, the Court noted that the Bontrager acquisition destroyed plaintiff's remedies against Johnson and the Amsted acquisition destroyed the plaintiff's cause of action against Bontrager. Id. at 350, 431 A.2d 811.
Having noted the destruction of Ramirez's remedies, the New Jersey Supreme Court observed that "[w]hat is most important, however, is that there was continuity in the manufacturing of the Johnson product line throughout the history of these asset acquisitions." Ibid. The Supreme Court found that, with Ramirez unable to look to Johnson and Bontrager (and South Bend I for that matter) for a recovery of damages, he should be able to look to Amsted. Ramirez, supra, 86 N.J. at 350-51, 431 A.2d 811. This was so, the Court reasoned, because a successor corporation continuing the line of business had the means available for avoiding the risk of harm caused by its predecessor's defective products *424 still present on the market. Ibid. The Court concluded that the second criterion in Ray v. Alad  the ability to assume the original manufacturer's risk-spreading role  was satisfied because Amsted occupied the same position as its predecessors, and would avoid the costs and spread the risk of injuries to users of defective Johnson presses. Id. at 352, 431 A.2d 811.
As to the third Ray criterion, the Court observed that Amsted benefitted substantially from the Johnson good will in continuing its product line. Ramirez, supra, 86 N.J. at 352, 431 A.2d 811. Amsted thus became an integral part of the overall producing and marketing enterprise. Ibid. The Court concluded that Amsted should bear the same burden of operating costs that other established business operations must bear. Id. at 352-53, 431 A.2d 811.
With respect to the uncertainties inherent in successor liability, the Supreme Court observed that not only could an acquiring corporation pay less for the assets, it could also obtain products liability insurance for contingent liability claims or enter into indemnification or escrow agreements with the selling corporation. Ramirez, supra, 86 N.J. at 354, 431 A.2d 811. The Court opined that in time these risk-spreading and cost-avoidance measures would become a normal part of business planning in the acquisition of the assets of a manufacturing enterprise. Id. at 357, 431 A.2d 811. In conclusion, the Supreme Court held:
Under today's determination the McKee approach is no longer the standard to be applied in determining the liability of a successor corporation for injuries caused by a defective product manufactured and placed in the stream of commerce by a predecessor. Rather, we hold that where one corporation acquires all or substantially all the manufacturing assets of another corporation, even if exclusively for cash, and undertakes essentially the same manufacturing operation as the selling corporation, the purchasing corporation is strictly liable for injuries caused by defects in units of the same product line, even if previously manufactured and distributed by the selling corporation or its predecessor. The social policies underlying strict products liability in New Jersey are best served by extending strict liability to a successor corporation that acquires the business assets and continues to manufacture essentially the same line of products as its predecessor, particularly where the successor corporation benefits from trading its product line on the name of the predecessor and takes advantage from its accumulated good will, business reputation and established customers.
[Emphasis added] [Id. at 358, 431 A.2d 811.]
*425 Although there was only one viable successor in Ramirez, there were at least two viable successors in the companion case of Nieves. There, the first intermediate successor, Harris Corporation (Harris), argued that as long as the last successor, Bruno-Sherman Corporation (Bruno-Sherman), was still susceptible to suit, Harris was entitled to judgment as a matter of law. Nieves, supra, 86 N.J. at 364, 431 A.2d 826. Nieves, like Class, suffered an amputation of his right arm in a press sold in 1941 and acquired as a second-hand purchase by Nieves' employer in 1966. The original manufacturer, T.B. and C.W. Sheridan Company (Old Sheridan), had sold its assets, good will and trade name to Harris in 1964. Ibid. Harris then formed a subsidiary (New Sheridan) which assumed the name of the soon-to-be-dissolved Old Sheridan. Ibid. New Sheridan received the assets of Old Sheridan and assumed its liabilities. Ibid. In 1968 New Sheridan merged with Harris, which continued to manufacture the Sheridan product line. Id. at 366, 431 A.2d 826. Thus, Harris acquired the liabilities of Old Sheridan through merger under traditional successor liability law. In 1972 Harris sold the Sheridan manufacturing assets to Bruno-Sherman, which continued the Sheridan product line while Harris continued manufacturing a different product line, just as the first intermediate successor did in this case. Ibid. Bruno-Sherman did not assume the liabilities of Old Sheridan, New Sheridan or Harris. Ibid.
Nieves sought recovery from both Harris and Bruno-Sherman. Nieves, supra, 86 N.J. at 366, 431 A.2d 826. The Court concluded that Bruno-Sherman occupied essentially the same position as Amsted in Ramirez, despite the fact that its asset acquisition did not cause the destruction of any intermediate successor. Id. at 368-70, 431 A.2d 826. Thus, the Nieves Court made clear that the mere observation by the Ramirez Court that the current successor's acquisition destroyed the plaintiff's potential cause of action against the intermediate successor was not a holding that such destruction was a prerequisite to the imposition of liability upon the current successor. From this it is clear that in the case sub *426 judice the continued operation of Wilson does not destroy the remedies of Class against any subsequent successor.
The Supreme Court next turned to the argument of Harris that there was no justification for imposing liability on an intermediate successor when a current, viable manufacturer exists. Nieves, supra, 86 N.J. at 370, 431 A.2d 826. Harris contended that the first criterion in Ray v. Alad  the destruction of plaintiff's remedies against the original manufacturer  was "concerned solely with finding one viable, extant corporate defendant that has succeeded to the manufacturing operation of the original manufacturer." Ibid. Addressing this argument, the Supreme Court held:
In so arguing Harris misinterprets the underlying purpose of this justification for the imposition of successor corporation liability. In Ray v. Alad, supra, the court was concerned not as much with the availability of one particular viable successor as it was with the unavailability of the original manufacturer by reason of its divestiture of assets and dissolution. The reason the Ray court focused upon only one corporate successor to the Alad product line is because there was only one viable, extant successor corporation  Alad II. The fact that there are two such successors to Old Sheridan in the present case does not alter the reality that Harris' acquisition of the business assets and manufacturing operation of Old Sheridan contributed to the destruction of the plaintiff's remedies against the original manufacturer. By acquiring the business assets of Old Sheridan and continuing the established operation of manufacturing and selling Sheridan die cutting products, Harris "became `an integral part of the overall producing and marketing enterprise that should bear the cost of injuries resulting from defective products.'" Ray v. Alad, supra, 19 Cal.3d at 34, 560 P.2d at 11, 136 Cal. Rptr. at 582 (quoting Vandermark v. Ford Motor Co., 61 [Cal.2d] Cal.3d 256, 262, 391 P.2d 168, 171, 37 Cal. Rptr. 896, 899 (1964). Harris's prominent role in the overall enterprise of manufacturing Sheridan die-cutting presses is not to be overlooked merely because plaintiff's injury did not occur while Harris was actually engaged in the manufacturing operation.
[Nieves, supra, 86 N.J. at 370-71, 431 A.2d 826.]
Having dispatched the arguments of Harris respecting the first criterion, the Court turned to the second criterion. Nieves, supra, 86 N.J. at 371, 431 A.2d 826. The Court held that both Harris and Bruno-Sherman had the ability to assume the original manufacturer's risk-spreading and cost-avoidance roles as evidenced by the terms and conditions of the 1972 purchase agreement between them. Ibid. That agreement provided that Bruno-Sherman did *427 not assume liability for damages caused by products delivered by Harris prior to the date of the agreement, and also provided that Harris would maintain insurance to cover such claims until the closing date. Ibid. The agreement also provided that Bruno-Sherman would indemnify Harris from any judgments arising out of the manufacture, sale or use of products manufactured by Bruno-Sherman. Id. at 372, 431 A.2d 826. The Court held:

As between the two successor corporations the provisions of this indemnification agreement, if applicable to the particular fact situation presented, should be given their intended effect as a risk-spreading and cost-avoidance measure. While the Ramirez rationale is concerned with imposing strict tort liability for damages caused by defects in units of the product line acquired and continued by successor manufacturers, neither Ramirez nor the injured plaintiff  if he successfully proves his case against the successors, who stand in the shoes of the original manufacturer  is concerned with how that liability will be allocated or borne as between two successor corporations.

[Nieves, supra, 86 N.J. at 372, 431 A.2d 826 (citation omitted, emphasis added).]
In the 15 years which have elapsed since the publication of Ramirez and Nieves, only a few Appellate and Law Division decisions have addressed product-line successor liability. These decisions will be discussed in the context of the defendants' arguments on which they bear.

Product-Line Successor Liability of P & F
P & F urges that it is not a successor to Ardcor, first, because it did not cause the destruction of Ardcor or Wilson and, second, because it never enjoyed the good will of Ardcor, merely holding its assets for fourteen months before reselling them at a very substantial loss. The position of P & F is somewhat similar to that of Packaging Industries Group (Packaging) in Pacius v. Thermtroll Corp., 259 N.J. Super. 51, 611 A.2d 153 (Law Div. 1992). Packaging, like P & F, did not contribute to the destruction of the original manufacturer, Thermtroll Corp., when it acquired selected assets from the Thermtroll product line for cash, including the right to develop and manufacture thermal automatic forming machines, although Thermtroll was no longer a viable corporation in 1992. Id. at 52-53, 611 A.2d 153. Packaging, like P & F, did not continue to manufacture the machine or service previously *428 manufactured machines. Id. at 53, 611 A.2d 153. It had no contact with Thermtroll customers and allowed Thermtroll patents to lapse. Unlike P & F, Packaging actually used the Thermtroll name for two years and used the Thermtroll blueprints to assist in the design of its own machines. Id. at 53, 611 A.2d 153. Fifteen years after the acquisition, Packaging sold the Thermtroll line as well as its Sentinel Division to Sencorp Systems which did not resume manufacture of the Thermtroll line, but agreed to defend product liability actions brought against Packaging. Id. at 53, 611 A.2d 153.
Observing that Ramirez and Nieves stood for the proposition that mere nonviability of the predecessor governed the imposition of liability and not the reason for nonviability, Judge Menza found that it was irrelevant that the successors did not cause the destruction of Thermtroll. Id. at 56, 611 A.2d 153. The court also found that a requirement that the successor continue to manufacture the product line of the predecessor "misses the point of what Ramirez and Nieves are all about" and that mere acquisition of the assets of the predecessor was determinative, not the fact that the product was continued by the successor. Id. at 57, 611 A.2d 153. This was so, Judge Menza reasoned, because Ramirez and Nieves both focussed on the benefit derived from acquiring those assets and the fairness of imposing the burdens associated with them. Id. at 57, 611 A.2d 153. The court pointed out that Packaging did benefit from the use of the Thermtroll line, utilized Thermtroll's blueprints, and eliminated a competitor; therefore, it had to bear the burden of product liability claims. Id. at 59, 611 A.2d 153.
P & F in this case obtained absolutely no benefit from the Ardcor assets. Its position vis-a-vis the enterprise of manufacturing roll-forming machines is akin to that of a used equipment broker. It merely bought, warehoused and resold the assets after fourteen months. The acquisition of manufacturing assets without any accompanying benefit to the purchaser, equivalent to the benefits articulated in Ramirez, Nieves, and Pacius, is insufficient *429 to impose liability under the product-line theory of successor liability.
The mere fact that P & F acquired the assets with intent to utilize them to manufacture roll-forming machines is insufficient to justify imposition of successor liability absent conduct in furtherance of that intent or some significant benefit derived from the mere acquisition of the assets. So, too, is the mere fact of adequate insurance and contractual risk-spreading and cost avoidance insufficient to trigger the status of a product-line successor, because more is required than satisfaction of the second Ray criterion. Rather, as Ramirez held, product-line successor liability is to be imposed "where one corporation acquires all or substantially all the manufacturing assets of another corporation ... and undertakes essentially the same manufacturing operation as the selling corporation...." Ramirez, supra, 86 N.J. at 358, 431 A.2d 811 (emphasis added). That element is totally missing in this case. As a consequence, the court finds that P & F was not liable to Class and is entitled to recover the monies paid by it in satisfaction of his claims.

Product-Line Successor Liability of Wilson
Wilson concedes that its acquisition of the Ardcor product line caused the virtual destruction of Class' remedies against Ardcor, the original manufacturer. Thus, the first Ray criterion has been satisfied as to Wilson.
Turning to the second Ray criterion, the agreement between Wilson and Ardcor clearly allocated risks between them. Furthermore, Wilson secured insurance to avoid the costs of the risks borne by it. When Wilson, in turn, sold the Ardcor assets to P & F, it retained all liabilities, including service and warranty obligations for products sold by it and B & K, and agreed to indemnify and hold P & F harmless from any damage or loss occasioned by any breach of covenant by it. Thereafter, Wilson continued to maintain product liability insurance. Thus, it is clear that Wilson assumed Ardcor's risk-spreading role while it was *430 manufacturing the Ardcor products and even thereafter through the purchase of liability insurance.[6]
As to the third Ray criterion, it is entirely fair to require Wilson to assume responsibility for defective Ardcor products. That burden necessarily attached to the Ardcor good will which was certainly enjoyed by Wilson from 1963 to 1968.
Wilson undertook the same manufacturing operation as Ardcor and fulfilled all three of the Ray criteria. Wilson, nevertheless, contends that Ramirez stands for the proposition that only the current viable manufacturer, American, is liable as a successor. Wilson acknowledges that in the Nieves case the Supreme Court held that "the Ramirez rationale is not necessarily so limited as to visit liability upon only the current, viable manufacturer of the product line. In certain situations both the current successor corporation and the intermediate manufacturer may be responsible under Ramirez." Nieves, supra, 86 N.J. at 365, 431 A.2d 826. However, Wilson urges that Nieves stands for the proposition that an intermediate successor is liable only when it has agreed to indemnify the current viable successor.[7] First, it is *431 not at all clear that the indemnification agreement at issue in Nieves was in fact applicable, an issue not reached ab initio by the Supreme Court but rather remanded to the trial court. Second, Wilson's argument tacitly invites this court to ignore the clear statement in the Nieves decision that neither the theory of product-line successor liability announced in Ramirez nor an injured consumer is concerned with how liability will be allocated or borne as between two successor corporations. This court declines to ignore the valid concerns of our Supreme Court and consumers injured by defective products.
The Appellate Division decision on which Wilson relies simply does not support its contention that only the current viable successor is liable as a matter of law. In Bussell v. DeWalt Products Corp., 259 N.J. Super. 499, 614 A.2d 622 (App.Div. 1992), certif. den., 133 N.J. 431, 627 A.2d 1137 (1993), the court imposed liability against the original manufacturer, DeWalt, and the current successor, Black & Decker, even though the intermediate, AMF, was still viable. Id. at 506, 614 A.2d 622. However, AMF was not a party to the action and the Appellate Division thus never reached the issue of whether AMF, too, was liable to plaintiff. Id. at 503, 614 A.2d 622. This court holds that Wilson is a product-line successor to Ardcor and liable to Class irrespective of the liability of American.

Product-Line Successor Liability of American
American concedes that it is a product-line successor to Ardcor. American has enjoyed the good will attached to the Ardcor product line since it acquired the Ardcor roll-forming assets in 1970. American also spread the risk of loss through an adequate liability policy covering product defects, although it did not secure an express indemnification agreement from P & F nor *432 did it expressly acquire the rights of P & F under the Wilson/P & F agreement. Because Wilson in the Wilson/P & F agreement retained all liabilities, American argues that Wilson is solely liable to Class. In addition, because American did not directly cause the destruction of Class' remedies against Ardcor or Wilson, it urges that Wilson should be primarily liable to Class, at least until its assets are exhausted, because Wilson was the only entity that caused the destruction of Ardcor.[8] Such a rule, of course, would exempt American from liability in this case because the indemnity policy issued to Wilson is sufficient to pay the damages of Class.
With respect to American's first argument, the position of American, vis-a-vis Wilson, is similar to those of Black & Decker and AMF, the intermediate successor in Bussell. AMF expressly assumed all liabilities and obligations of the original manufacturer, DeWalt, and later transferred the DeWalt assets to a wholly owned AMF subsidiary. Bussell, supra, 259 N.J. Super. at 506, 614 A.2d 622. Black & Decker later purchased the stock of that AMF subsidiary, dissolved it, and assumed all of its obligations. Id. at 507-08, 614 A.2d 622. Black & Decker took over the defense of DeWalt.[9]Id. at 504, 508, 614 A.2d 622. Citing Nieves, the court held that the express "assumption of liability by an intermediate purchaser ... does not cause a break in the chain of liability of subsequent successor corporations." Id. at 518, 614 A.2d 622. Similarly, here the express contractual retention of liabilities by Wilson does not cause a break in the chain of liability based on status of subsequent successor corporations.
As to American's second argument, the Bussell court rejected the argument that Black & Decker did not cause the *433 destruction of DeWalt, adopting the reasoning of Judge Menza in Pacius, supra, 259 N.J. Super. at 56, 611 A.2d 153, that the fact of nonviability governed the imposition of liability, not the reason for it. Bussell, supra, 259 N.J. Super. at 519, 614 A.2d 622. Observing that "[t]he product-line approach to liability was adopted by the Supreme Court in order to provide plaintiffs a remedy where they otherwise might not have one," the Bussell court imposed liability on Black & Decker based on the virtual destruction of DeWalt without regard to the viability of AMF. Id. at 520, 614 A.2d 622.
Wilkerson v. C.O. Porter Mach. Co., 237 N.J. Super. 282, 567 A.2d 598 (Law Div. 1989), reached a similar result. The court there held that the Ramirez phrase, "caused by the successor's acquisition of the business," was not to be read literally to refer to the act of the successor, but the fact of the sale which destroyed the manufacturer's business. Id. at 289-90, 567 A.2d 598. Pointing to the discussion in Nieves, supra, at 370-371, 431 A.2d 826, to the effect that the Ray court was not as much concerned "with the availability of one particular viable successor as it was with the unavailability of the original manufacturer," the Bussell court observed that:
This language is strong evidence that our Supreme Court sees the transfer of assets and the manufacturer's unavailability to answer in damages as the triggering circumstances and not the precise role of the transferee nor the form of the transfer.
[Id. at 290, 567 A.2d 598 (footnote omitted.)]
In conclusion, the court held that:
Under Ramirez, the destruction of plaintiff's remedy against the manufacturer occurs by virtue of the transfer of the assets of the product line, combined with the manufacturer's effective dissolution and the purchaser's continuation of the product line. The purchaser need not do more to satisfy the first Ray factor.
[Id. at 291, 567 A.2d 598.]
Of course, Bussell and Wilkerson merely held that the current viable successor was liable to an injured products liability plaintiff even though that successor did not itself cause the destruction of the original manufacturer and even though one or more intermediate successors remained viable. No New Jersey decision has been *434 found in which a court was called upon to decide whether a viable intermediate successor should be primarily liable because that successor was the entity causing the destruction of the original manufacturer. However, we may infer from Nieves that such a result was not contemplated by the Supreme Court under the product-line successor theory announced in Ramirez and Nieves. If the Supreme Court intended that the entity responsible for the destruction of the original manufacturer should be primarily liable, then the Court would have had no need to visit liability upon the current successor, Bruno-Sherman, and discuss possible indemnification of Bruno-Sherman by the intermediate successor, Harris, which had caused the destruction of the original manufacturer. Rather, the Supreme Court could have simply ruled that Harris was primarily liable to the full extent of its assets and, if those assets were insufficient, that Bruno-Sherman would be secondarily liable.
There is no readily apparent policy reason mandating the creation of the rule of law sought by American. It is clear that the entire focus of the Ramirez and Nieves decisions is the desire to make persons injured by manufactured products whole. That policy is not served by placing on an injured plaintiff the burden of demonstrating that they have exhausted the assets seriatim of viable intermediate successors before they can obtain redress from the current viable successor. As the Supreme Court stated, neither Ramirez nor an injured plaintiff "is concerned with how ... liability will be allocated or borne as between two successor corporations." Nieves, supra, 86 N.J. at 372, 431 A.2d 826. Therefore, American, like Wilson, is fully liable to Class.

The Right of P & F to Indemnification Under the Wilson/P & F Agreement
Needless to say, the agreement by Wilson to retain all liabilities carries with it an implied agreement to satisfy those obligations, at least insofar as they might affect P & F. See Onderdonk v. Presbyterian Homes of N.J., 85 N.J. 171, 182-83, 425 A.2d 1057 (1981). As a consequence, a failure to satisfy any *435 liability or obligation of Wilson would be a breach of the covenant in § 12, and P & F would be entitled to indemnification under § 6 for any damage or loss incurred by it as a consequence of such a failure by Wilson. Here, Wilson was liable to Class under the theories of liability adopted in Ramirez and Nieves and was obligated to respond to him in damages for any product defect, whereas P & F was not so obligated. Wilson did not satisfy all of its obligation to Class and P & F was damaged as a result. As a consequence, P & F is entitled under this indemnification provision to recover the money it paid to Class together with reasonable counsel fees and costs incurred in defending the claims of Class. Bethlehem Steel Corp. v. K.L.O. Weld. Erectors, 132 N.J. Super. 496, 499-500, 334 A.2d 346 (App.Div. 1975). However, P & F is not entitled to recover counsel fees and costs incurred in prosecuting its indemnification claims against Wilson. R. 4:42-9(a).

American's Right to Indemnification Under the Wilson/P & F Agreement
American baldly asserts that it "was a third party beneficiary of the written agreement between Lee Wilson Co. and P & F Industries." No legal authority is provided to support this conclusion. In order to occupy the status of a third-party beneficiary, American must demonstrate that the parties to the contract intended to make American a beneficiary thereunder. Broadway Maintenance Corp. v. Rutgers, The State University, 90 N.J. 253, 259, 447 A.2d 906 (1982); Borough of Brooklawn v. Brooklawn Housing Corp., 124 N.J.L. 73, 76-77, 11 A.2d 83 (E. & A. 1940). There is no such evidence before this court. As a result, American is not entitled to indemnification under the Wilson/P & F contract.

Responsibility of Wilson and American to Respond in Damages
Because liability is imposed upon Wilson and American without regard to fault, Wilson and American are not joint tortfeasors *436 entitled to contribution under the Joint Tortfeasors Contribution Law, N.J.S.A. 2A:53A-1. Since the only issue before the court is the liability of the successors for the original manufacturer's defective product, there is no basis for application of the Comparative Negligence Act, N.J.S.A. 2A:15-5.1, neither American nor Wilson having been negligent in manufacturing a defective product.
At present, Wilson is responsible for $500,000 of the damages paid to Class and American has paid $375,000  $250,000 for the product defect and $125,000 for the failure to warn. Two options exist: Wilson and American can be left where they are, with Wilson paying double what American has paid for the product defect, or damages from the product defect can be split equally.
It has long been recognized that:
Contribution is an equitable principle of equality in the sharing of a common burden arising out of contract or status, to enforce restitution and prevent unjust enrichment, that at common law does not extend to persons in equal or mutual fault. Equality among those in aequali jure is a formula grounded in equity, good morals, and natural justice that is withheld from wrongdoers, save as provided by statute; but it is in its ultimate analysis a rule of policy designed also to serve the social and political well-being of the state by restraining a mischievous tendency, a concept that has undergone substantial modification to accord with altered social needs and the teachings and promptings of experience. Where each party is equally at fault, so runs the old rule, the law will not aid one as against the other. The law will leave the parties where it finds them.
[Pennsylvania Greyhound Lines, Inc., v. Rosenthal, 14 N.J. 372, 387, 102 A.2d 587 (1954).]
Where a workers' compensation award cannot on any factual basis be apportioned among seriatim employers, entities liable to an injured worker based on their status, equal apportionment has been approved. Baijnath v. Eagle Plywood & Door Mfgrs., Inc., 261 N.J. Super. 309, 315, 618 A.2d 902 (App.Div. 1993); Quinn v. Automatic Sprinkler Co., 50 N.J. Super. 468, 481, 142 A.2d 655 (App.Div. 1958). "`Equity is equality.'" Crane v. Bielski, 15 N.J. 342, 349, 104 A.2d 651 (1954).
Here, Wilson and American bear a common burden to respond to plaintiff in damages based solely on their status as *437 product-line successors. Being in aequali jure, equity demands that they bear this burden equally.[10] Thus, where the assets of two or more product-line successors are sufficient to permit the court to do equity among them, they should be compelled to bear their common burden equally. In no case, however, should this affect or limit the right of injured plaintiffs to recover any portion or all of their damages from any one or more of the viable product-line successors, as the injured plaintiff is not concerned with how liability will be borne among them. Nieves, supra, 86 N.J. at 372, 431 A.2d 826. Therefore, Wilson is entitled to common law indemnification from American in the amount of $125,000.
NOTES
[1] From October 1967, until June of 1968, a purchaser under contract, B & K Machinery International Limited, manufactured the Ardcor and Seco product lines. That purchase transaction was never completely consummated. It is not relevant here despite the fact that certain unspecified Ardcor/Seco machinery was sold by B & K because the Ardcor business and the remaining assets were ultimately transferred to P & F by Wilson.
[2] On November 2, 1990, Class began his own action, unaware of the earlier-filed Haydon action. Haydon thereafter voluntarily dismissed its action and permitted the prosecution of the action by Class, asserting a lien on any recovery by Class. At the time the action was settled, the gross worker's compensation lien was $132,148.07. Interestingly, Haydon's direct action against Wilson could have sounded entirely in contract for breach of warranty with the compensation benefits treated as consequential damages. Class included a claim for breach of warranty in this action. No party, however, has urged that the gross compensation lien should be taken outside the scope of successor product liability and allocated exclusively to Wilson as an assumed contractual obligation.
[3] No information was supplied respecting compliance with or breach of this provision, nor was Exhibit B-1 supplied to the court. Presumably, it had no relevance here.
[4] The fact that P & F expressly excluded liability for the warranty obligations of Wilson and B & K but did not expressly exclude the warranty obligations of Ardcor in the Wilson/P & F contract is consistent with an assumption by Wilson of those Ardcor obligations. No evidence has been submitted, however, which demonstrates that Wilson actually performed Ardcor's warranty obligations.
[5] No evidence relevant to the other exceptions has been offered which would warrant imposition of liability under the traditional rule upon P & F or American.
[6] Wilson argues, hypothetically, that a viable intermediate successor might lower its coverage limits after sale of the product line assets, and thus liability ought not to be imposed on the viable intermediate successor. Because the insurance available to Wilson is adequate, this argument is not particularly compelling.
[7] In support of this argument, Wilson urges that California does not impose liability on intermediate successors, citing Kaminski v. Western MacArthur Co., 175 Cal. App.3d 445, 220 Cal. Rptr. 895, 901 (1985). However, Kaminski does not so hold. There, in discussing the liability of a succeeding distributor which acquired the assets of the original distributor, the court merely observed:

Nothing in Ray conceptually limits its reasoning to manufacturers. A distributor in the stream of commerce is a potential defendant for injured products liability plaintiffs; should a corporation succeed that distributor under the criteria set forth in Ray, the succession effectively removes the predecessor from the plaintiff's pool of recovery.
[emphasis added.] [Ibid.]
Because the Ray criteria require a virtual destruction of a plaintiff's remedies against the predecessor, it is only in that sense that the succession "effectively removes" the predecessor from the pool, not because intermediate successors are ipso facto relieved of liability because of a sale even though they continue in business. Kaminski did not discuss the liability of an intermediate successor which remained viable after an asset sale.
[8] Of course, in Nieves the intermediate successor remained viable, yet liability was not imposed on it first as a matter of law.
[9] Because Black & Decker took over the defense of DeWalt, it would not be unreasonable to assume that the liabilities of DeWalt flowed through AMF to Black & Decker, although the record in Bussell was silent on such an assumption and the court presumed that it did not exist. Id. at 520, 614 A.2d 622.
[10] P & F urged that seriatim product-line successors should be liable to an injured plaintiff based on each successor's "years on the risk." Such a rule may well be inconsistent with Ramirez and Nieves. Even if it is not, the development of new law such as this is better left to the Appellate Division. Lombardo v. Hoag, 269 N.J. Super. 36, 47-48, 634 A.2d 550 (App.Div. 1993), cert. den., 135 N.J. 469, 640 A.2d 850 (1994); Coyle v. Englander's, 199 N.J. Super. 212, 219, 488 A.2d 1083 (App.Div. 1985); Sykes v. Zook Enterprises, Inc., 215 N.J. Super. 461, 471, 521 A.2d 1380 (Law Div. 1987).