705 A.2d 390

RAMON CLASS, PLAINTIFF, v. AMERICAN ROLLER DIE CORP., T/A ARDCOR, AN OHIO CORPORATION, DEFENDANT–RESPONDENT/CROSS–APPELLANT, AND LEE WILSON ENGINEERING COMPANY, INC., AN OHIO CORPORATION, DEFENDANT–APPELLANT/CROSS–RESPONDENT, AND B & K MACHINERY INTERNATIONAL LIMITED, A FOREIGN CORPORATION; COMPANY(S) 4–6, DESIGNERS AND/OR MANUFACTURERS OF PRESSES; MECHANICAL STEEL TUBING CORP.; COMPANY(S) 8–10, DISTRIBUTORS OF PRESSES MANUFACTURED BY AMERICAN ROLLER DIE CORP., T/A ARDCOR, LEE WILSON ENGINEERING COMPANY, INC., B & K MACHINERY INTERNATIONAL LIMITED, AND P & F INDUSTRIES AND COMPANY(S) 4–6; BILL KNATH MACHINERY COMPANY; COMPANY(S) 11–13, MAINTENANCE COMPANIES OF STRUT MILL CUT–OFF PRESSES; SUTTER MANUFACTURING TOOL & DIE CO., DIVISION OF MJM TOOLING CORP., MANUFACTURER OF DIES TO BE USED IN CONJUNCTION WITH THE STRUT MILL CUT–OFF PRESS MANUFACTURED AND DESIGNED BY AMERICAN ROLLER DIE CORP., T/A ARDCOR, LEE WILSON ENGINEERING COMPANY, INC., B & K MACHINERY INTERNATIONAL LIMITED, P & F INDUSTRIES AND COMPANY(S) 4–6; BC COMPANY(S) MANUFACTURERS OF VARIOUS COMPONENT PARTS TO THE STRUT MILL CUT–OFF PRESS MANUFACTURED AND DESIGNED BY AMERICAN ROLLER DIE CORP., T/A ARDCOR, LEE WILSON ENGINEERING COMPANY, INC., B & K MACHINERY INTERNATIONAL LIMITED, P & F INDUSTRIES AND COMPANY(S) 4–6, XYZ COMPANY(S), DISTRIBUTORS OF VARIOUS COMPONENT PARTS AND/OR NECESSARY PARTS TO STRUT MILL CUT–OFF PRESSES; HAYDON CORPORATION, DEFENDANTS, AND P & F INDUSTRIES, INC., A FOREIGN CORPORATION, DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued December 3, 1997—Decided January 30, 1998.

Before Judges BAIME, BROCHIN and BRAITHWAITE.

*William C. Carey,* argued the cause for appellant/cross-respondent (*McElroy, Deutsch & Mulvaney,* attorneys; *Nancy McDonald* and *Mr. Carey,* on the brief).

*Thomas M. O'Hara,* argued the cause for respondent P & F Industries, Inc. (*Clemente, Gesicki & O'Hara,* attorneys; Mr. O'Hara, on the brief).

*Terri Smith,* argued the cause for respondent/cross-appellant Ardcor Press Manufacturing Company, Inc., Ardcor, Division of American Roll Tooling, Inc. (*Stevens & Minter,* attorneys; *Ms. Smith,* of counsel and on the brief).

The opinion of the court was delivered by

BRAITHWAITE, J.A.D.

This appeal involves the issue of product line successor liability. Plaintiff, Ramon Class, was injured at work in November 1988, while operating a press that was manufactured in 1954. The original manufacturer of the press, American Roller Die Corporation (Ardcor), dissolved prior to the accident. Plaintiff initiated a product liability action naming various corporations as defendants. Three of those defendants, Lee Wilson Engineering Company, Inc. (Wilson), American Roll Tooling, Inc. (American), and P & F Industries (P & F), settled with plaintiff for $875,000, with each defendant paying $250,000. American paid plaintiff an additional $125,000 to settle a separate failure to warn claim that is not raised on appeal. The settlement agreement further provided that Wilson, American, and P & F retained the right to seek a

judicial determination of their individual liability as alleged *seriatim* successors to the original manufacturer of the press and their rights and obligations *inter sese.*

The chain of succession of the Ardcor product line included Wilson, the first successor that owned and manufactured the product line from 1963 until 1968. Wilson then entered into a sales agreement with the second successor, P & F, that owned and stored the product line between 1968 and 1970, but did not manufacture any products. P & F entered into a sales agreement with American, the third successor, that has owned and continued to manufacture the product line since 1970.

In determining liability, the trial judge relied on *Ramirez v. Amsted Industries, Inc.,* 86 *N.J.* 332, 431 *A.*2d 811 (1981), and *Nieves v. Bruno Sherman Corp.,* 86 *N.J.* 361, 431 *A.*2d 826 (1981), and imposed successor liability on both Wilson and American, and held them equally liable for plaintiff's damages. She found that P & F, was not subject to successor liability because it only owned and stored the assets, but did not manufacture the product line.

In addition, in construing the purchase agreement between Wilson and P & F, the judge held that Wilson was obligated to pay P & F a stipulated amount of $29,000 that P & F expended in attorneys fees in defending the lawsuit by plaintiff.

Wilson appeals, asserting that the judge improperly imposed successor liability upon it when American is a currently viable manufacturer. Essentially, Wilson argues that since American is still a viable entity, it should be solely liable for plaintiff's damages.

In the alternative, Wilson asserts that if successor liability was properly imposed, then the judge erred in ordering equal payments by Wilson and American to satisfy plaintiff's damages. Wilson claims that it should only be responsible for an apportionment of the damages to plaintiff based on a contributive share of plaintiff's loss, measured by the number of years that each corporation owned and manufactured the Ardcor product line. Finally,

Wilson contends that the judge improperly determined that it should have to pay attorney fees and defense costs to P & F.

American cross-appeals, arguing that successor liability was improperly imposed upon it and that Wilson should be solely responsible for plaintiff's damages. Alternatively, American asserts that if both Wilson and American are responsible successors, they should pay an equal share of plaintiff's damages.

██ We affirm the trial judge's determination that both Wilson and American are successor corporations and therefore are liable for plaintiff's damages under the product line theory, substantially for the reasons expressed by the trial judge in her published opinion found at 294 *N.J.Super.* 407, 429–34, 683 *A.2d* 595 (Law Div.1996).[1] However, we reverse the order directing an equal apportionment of damages between Wilson and American and hold that under these circumstances, plaintiff's damages should be apportioned based upon the number of years that the successor corporations manufactured the product line. We also reverse the order directing Wilson to pay attorneys fees and defense costs to P & F.

## I

We need not reiterate the facts necessary for a resolution of the issues on appeal because they are fully set forth in the trial judge's opinion. Suffice it to say, Wilson purchased Ardcor's "assets of every kind and description . . ., except for certain listed assets not relevant here" on April 1, 1963. *Id.* at 413, 683 *A.2d* 595. Wilson continued the production of the Ardcor product line until October 1968 when it sold the Ardcor and Seco assets to P & F.

---

[1] All of the parties agree that the trial judge correctly concluded that successor liability should not be imposed on P & F because it only owned and stored the Ardcor assets as opposed to manufacturing the product line. This issue is not raised on appeal.

Section twelve of the agreement between Wilson and P & F provided as follows:

12. *No Assumption of Liabilities.* It is understood and agreed that the total purchase price to be paid by Buyer [P & F] hereunder is the amount stated in Section 2 hereof, and that Buyer [P & F] assumes no liability or obligation whatsoever of Seller [Wilson] including service and warranty obligations with respect to products of the Ardcor and Seco Product Lines heretofore sold by Seller [Wilson] or B & K Machinery International Limited.

After the transfer of the Ardcor and Seco assets to P & F, Wilson continued to service previously-sold Ardcor and Seco products and to manufacture other product lines until 1993. *Class, supra,* 294 *N.J.Super.* at 414–15, 683 *A.*2d 595. Wilson formally dissolved in 1994. Therefore, Wilson was in business when plaintiff was injured in 1988. *Ibid.* In fact, in 1988, it had a "one million dollar indemnity policy covering product defects." *Id.* at 415, 683 *A.*2d 595.

P & F never manufactured the product line after its acquisition of the Ardcor and Seco businesses; it only stored the machinery in a warehouse. *Ibid.* In January 1970, P & F sold everything it purchased from Wilson, including the Ardcor products, to American. American operated the Ardcor business from 1970 until the settlement of plaintiff's claim. *Id.* at 415–16, 683 *A.*2d 595.

## II

After determining that both Wilson and American are both responsible for plaintiff's damages, the next step is to apportion damages between those corporations. Neither *Ramirez* nor *Nieves* addressed the issue of allocation of damages among successor corporations. In fact, the *Nieves* Court specifically stated:

While the *Ramirez* rationale is concerned with imposing strict tort liability for damages caused by defects in units of the product line acquired and continued by successor manufacturers, neither *Ramirez* nor the injured plaintiff—if he successfully proves his case against the successors, who stand in the shoes of the original manufacturer—is concerned with how that liability will be allocated or borne as between two successor corporations.

[*Nieves, supra,* 86 *N.J.* at 372, 431 *A.*2d 826.]

In *Nieves*, the Court only recognized that the two successor corporations had indemnification provisions in their agreement, and stated that "if applicable to the particular fact situation presented, [indemnification agreements] should be given their intended effect as a risk-spreading and cost-avoidance measure." *Ibid.* Here, no such provisions are applicable. Thus, allocation of damages among liable successor corporations was an issue of first impression for the trial judge.

The trial judge acknowledged that because product line liability imposed upon successor corporations is "without regard to fault," neither the Joint Tortfeasors Contribution Law, *N.J.S.A.* 2A:53A–1, nor the Comparative Negligence Act, *N.J.S.A.* 2A:15–5.1, are applicable to this case. *Class, supra,* 294 *N.J.Super.* at 435–36, 683 *A.*2d 595. We do not decide, nor do we perceive a need to decide here if that conclusion is correct. To apportion plaintiff's damages the trial judge relied on the contribution principle that "equity is equality" and determined that both Wilson and American should be equally responsible for plaintiff's damages. *Id.* at 436, 683 *A.*2d 595. The judge referred to worker's compensation awards and stated that where such awards "cannot on any factual basis be apportioned among seriatim employers, entities liable to an injured worker based on their status, equal apportionment has been approved." *Ibid.* (citations omitted).

American agrees with the trial judge's reasoning that if both American and Wilson are successor corporations, then the liability should be equally divided. Wilson argues that the liability should not be equally divided, but rather apportioned based on the number of years that each of the companies manufactured the product line. Here, Wilson manufactured the product line from 1963 until 1968, a period of approximately five years.[2] American manufactured it from 1970 until 1988, the year of plaintiff's

---

[2] Although, as we previously stated, Wilson continued to service Ardcor products until 1993, it manufactured the Ardcor product line only between 1963 and 1968, when it transferred the product line to P & F.

accident, some eighteen years. Wilson argues that it would be fair to apportion damages based on those years of operation.

Because a strong policy reason for the imposition of successor liability is that the corporation "benefits from trading its product line on the name of the predecessor and takes advantage from its accumulated good will, business reputation and established customers," *Ramirez, supra,* 86 *N.J.* at 358, 431 *A.*2d 811, we conclude that apportioning damages based on the benefits received by each successor corporation is the appropriate method to allocate plaintiff's damages. Although the benefits received by any individual successor may be difficult to measure, we believe a reasonable basis for allocation is the number of units produced by each successor corporation during the period of time they manufactured the product line up to the date of plaintiff's accident, assuming that this information is available. In other words, the damages payable by each corporation should be calculated as the number of units produced by each successor corporation bears to the total number of units produced by all successor corporations up to the date of plaintiff's accident.

Here, the number of units produced by Wilson and American during the period of their respective operations of the Ardcor product line, up to the date of plaintiff's accident, is unknown. Because this information is unavailable, we conclude that the next best method is to apportion damages by the number of years each successor corporation manufactured the product line up to the date of plaintiff's accident, information that is available here. The damages payable by Wilson and American should be calculated as the number of years each corporation manufactured the product line bears to the total number of years both corporations manufactured the product line up to the date of plaintiff's accident. Where information reflecting the number of units produced is unavailable, we are satisfied that the number of years that a successor corporation manufactured the product line bears a reasonable relationship to the benefits received by each corporation.

We recognize that this basis of apportionment is not without its faults, and is therefore lacking in precision. We conclude, however, that many, if not all, methods to apportion damages lack precision and allocations are simply justifiable means to accomplish what is fair and reasonable. *Cf. Sindell v. Abbott Laboratories,* 26 *Cal.*3d 588, 163 *Cal.Rptr.* 132, 145, 607 *P.*2d 924, 937 (1980) ("But just as a jury cannot be expected to determine the precise relationship between fault and liability in applying the doctrine of comparative fault or partial indemnity, the difficulty of apportioning damages among the defendant producers in exact relation to their market share does not seriously militate against the rule we adopt.") (citations omitted), *cert. denied.,* 449 *U.S.* 912, 101 *S.Ct.* 286, 66 *L.Ed.*2d 140 (1980).

We conclude that an equal apportionment of damages is not fair and just under the circumstances. Wilson manufactured the Ardcor product line for approximately five years; American manufactured that product line for approximately eighteen years before plaintiff was injured. This difference in time fairly reflects the difference in the benefits that each received from the "good will [they] enjoyed ... in the continued operation of the [Ardcor] business." *Ramirez, supra,* 86 *N.J.* at 349, 431 *A.*2d 811 (quoting *Ray v. Alad Corp.,* 19 *Cal.*3d 22, 136 *Cal.Rptr.* 574, 580, 560 *P.*2d 3, 9 (1977)). This difference should be reflected in the quantum of damages each corporation is responsible to pay.

We find support for the use of the number of units produced during the operation of the product line, when that information is available, or the number of years each successor manufactured the product line when the unit information is unavailable, to determine the portion of damages payable by each successor corporation in the allocation principles of market share analysis, recognizing that this theory is used to determine liability in certain situations. *See Sindell, supra, discussed in Shackil v. Lederle Laboratories,* 116 *N.J.* 155, 561 *A.*2d 511 (1989).

The market share theory of liability is typically used in DES cases where an injured plaintiff must join as defendants manufac-

turers representing a substantial share of the particular market for a product. *E.g.*, 63 *Am.Jur.*2d Products Liability § 179, at 213 (1997). In essence, the theory "imposes presumptive liability based upon a manufacturer's share of the market of the injury-causing product, shifting the burden of proof to the defendants to show that they could not have made the specific product which injured the plaintiff." *Id.* at 213–14 (citation omitted). The theory is operative "where all defendants produced the type of product in question from an identical formula and the manufacturer of the specific unit or units of the product by which the plaintiff was allegedly injured cannot be identified through no fault of the plaintiff." *Id.* at 214.

To impose successor liability our Supreme Court in *Ramirez* adopted the three-fold justification announced in *Ray v. Alad Corp., supra,* 136 *Cal.Rptr.* at 580, 560 *P.*2d at 9. They are:

> (1) The virtual destruction of the plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business, (2) the successor's ability to assume the original manufacturer's risk-spreading role, and (3) the fairness of requiring the successor to assume a responsibility for defective products that was a burden necessarily attached to the original manufacturer's good will being enjoyed by the successor in the continued operation of the business.
>
> [*Ramirez, supra,* 86 *N.J.* at 349, 431 *A.*2d 811 (citation omitted).]

Underlying both successor liability and market share liability is the need to create a cause of action for injured plaintiffs in a products liability case where traditional principles of tort liability would leave them without a remedy. Moreover, both doctrines rely on the principle that as between an innocent injured plaintiff and a manufacturer of a product, the manufacturer is in the best position to bear the costs of injuries resulting from defective products. *Sindell, supra,* 163 *Cal.Rptr.* at 144, 607 *P.*2d at 936; *See Ramirez, supra,* 86 *N.J.* at 350–51, 431 *A.*2d 811.

The market share analysis addresses the issue of liability, particularly "causation-in-fact," *Shackil, supra,* 116 *N.J.* at 158, 561 *A.*2d 511; however, because of its similar reasons for imposing liability, it provides support to justify apportionment of damages in a successor liability case. In *Sindell,* "the seminal market

share case," the California Supreme Court addressed the alloca-
tion of damages among defendants. *Shackil, supra,* 116 *N.J.* at
166, 561 *A.*2d 511. Specifically, the court recognized that the
market share analysis "provides a ready means to apportion
damages among the defendants," by holding that "[e]ach defen-
dant will be held liable for the proportion of the judgment
represented by its share of that market unless it demonstrates
that it could not have made the product which caused plaintiff's
injuries." *Sindell, supra,* 163 *Cal.Rptr.* at 145, 607 *P.*2d at 937.
Thus, the *Sindell* court recognized that this allocation of damages
would approximate the responsibility for injuries caused by each
defendant's product. *Ibid.*

We are satisfied that the rationale for imposing successor
liability is consistent with reasons for imposing market share
liability, and deem it appropriate to use the market share liability
approach to damages as the model for apportioning damages in a
successor liability case such as this one, where more than one
successor is liable for plaintiff's injuries. In adopting the product-
line successor liability theory, the *Ramirez* Court stated:

> [t]he social policies underlying strict products liability in New Jersey are best
> served by extending strict liability to a successor corporation that acquires the
> business assets and continues to manufacture essentially the same line of products
> as its predecessor, particularly where the successor corporation benefits from
> trading its product line on the name of the predecessor and takes advantage from
> its accumulated good will, business reputation and established customers.
>
> [*Ramirez, supra,* 86 *N.J.* at 358, 431 *A.*2d 811.]

The product line theory focuses on a successor corporation that
"continues to manufacture essentially the same products as its
predecessor." *Ibid.* Comparable to the market share theory,
those successor corporations represent the "market" for the prod-
uct that caused a plaintiff's injuries. Consistent with *Ramirez,* as
the liability follows the product line, it is fair and reasonable to
apportion plaintiff's damages among multiple successors based on
the benefits received from the product line as reflected by the
number of units produced, and in the absence of that information,
the number of years that each corporation manufactured the
product. Similar to damages apportioned based upon a defen-

dant's share of the market, these are both appropriate measures to allocate plaintiff's damages between Wilson and American as manufacturers of the Ardcor product line.

### III

We reverse the order requiring Wilson to indemnify P & F for attorney's fees and defense costs. Paragraph twelve of the agreement between Wilson and P & F is not an indemnification agreement. It is simply an agreement that P & F would not assume any liabilities. The agreement did not guarantee that P & F would not be sued on a judicially-created theory of liability established after the parties' agreement. Wilson did not breach any obligation to P & F when P & F was sued by plaintiff. Wilson was not responsible to P & F for plaintiff's choice of defendants.

Affirmed in part; reversed in part and remanded for entry of a judgment apportioning plaintiff's damages in accordance with this opinion.