183 P.3d 734

DEL MONTE FRESH PRODUCE (HAWAII), INC., Plaintiff–Appellee,

v.

FIREMAN'S FUND INSURANCE COMPANY; American Home Assurance Company; American Re–Insurance Company; Commercial Union Insurance Company; Lexington Insurance Company; National Continental Insurance Company; Motor Vehicle Casualty Company, and London Market Insurers, Defendants–Appellants,

and

Continental Insurance Company, Lumbermens Mutual Insurance Company, Cigna Property & Casualty Company; Progressive Casualty Company, Accident & Casualty Company, Accident & Casualty Company No. 2 A/C, Accident & Casualty Insurance Company No. 3 A/C, Andrew Weir Insurance Company, Ltd., Argonaut Northwest Insurance Company, Ltd., Assicurazioni Generali di Trieste de Venezia, Assicurazionis Generali S.P.A., Bellafonte Insurance Company, Bermuda Fire & Marine Insurance Company, Bishopsgate Insurance Company, Ltd., Britishgate Insurance Company, Ltd., British North–Western Insurance Company, Ltd., Delta–Lloyd Non Life Insurance Company, Ltd., Edinburgh Assurance Company, Ltd., Excess Insurance Company, Ltd., Fidellidade Insurance Company, Ltd., Hawk Insurance Company, Ltd., Helvetia Insurance Company, Ltd., Highlands Insurance Company, London & Overseas Insurance Company, Ltd., Mentor Insurance Company, (UK), Ltd., Minster Insurance Co., Ltd., Mutual Reinsurance Company, Ltd., National Casualty Company of America, New London Reinsurance Company, Ltd., River Thames Insurance Company, Ltd., St. Helen's Insurance Company, Ltd., St. Katherine Insurance Company, Stronghold Insurance Company, Ltd., Swiss Union General Insurance Co., Ltd., Turegum Insurance Company, Ltd., Walbrook Insurance Company, Ltd., Winterthur Swiss Insurance Company, World Auxiliary Insurance Corporation, Ltd., Yasuda Fire & Marine Insurance Company (UK), Ltd., Certain Underwriters at Lloyd's London, Certain Underwriting Syndicates at Lloyds, London, Del Monte Corporation, RJR Nabisco, Inc., and Does 1 Through 2000, Inclusive, Defendants.

No. 24647.

Supreme Court of Hawai'i.

Dec. 26, 2007.

Keith K. Hiraoka, April Luria and Jodie D. Roeca of Roeca Louie & Hiraoka, on the briefs, for defendant-appellant National Continental Insurance Company.

Peter W. Olson and Stacey Kawasaki Djou of Cades Schutte Fleming & Wright and Ray Tamaddon, (Pro hac vice), of Berman & Aiwasian, on the briefs, for defendant-appellant Motor Vehicle Casualty Company on the brief and joinder.

W. Thomas Fagan and Kelvin H. Kaneshiro of Reinwald O'Connor & Playdon LLP and Patrick A. Cathcart (Pro hac vice), Yvette D. Roland (Pro hac vice), Gina P. Mak (Pro hac vice), Michael R. Fischer (Pro hac vice), Banchmalak T. Abegaze (Pro hac vice), of Hancock Rothert & Bunshoft LLP, on the briefs, for defendants-appellants Certain Underwriters at Lloyd's London, and Certain London Market Insurance Companies.

Paul T. Yamamura and Wesley D. Shimazu of Kanae and Yamamura and Jeffrey C. Segal, (Pro hac vice), and Richard D. Bremer, (Pro hac vice), of Selman Breitman LLP, on the briefs, for defendant-appellant Commercial Union Insurance Company.

Faye M. Koyanagi and Adrian Y. Chang of the Law Office of Faye M. Koyanagi and Donald T. McMillan, (Pro hac vice), and George J. Keller, (Pro hac vice), of Rivkin Radler LLP, on the briefs, for defendant-appellant Fireman's Fund Insurance Company.

Kevin S.W. Chee, Keith K. Kato and Jeffrey S. Masatsugu of Chee & Markham and Maria G. Enriquez, (Pro hac vice), on the briefs, for defendant-appellant American Re-Insurance Company on the joinder.

Michael A. Lorusso and Brian A. Kang of Watanabe, Ing & Kawashima and J. Karren Baker, (Pro hac vice), of Sinnott, Dito, Moura & Puebla, on the briefs, for defendants-appellants American Home Assurance Company and Lexington Insurance Company on the joinder.

John R. Myrdal, Scott I. Batterman and Tred R. Eyerly of Stanton Clay Chapman Crumpton & Iwamura and Michael J. Lynch, (Pro hac vice), of Kirkpatrick & Lockhart LLP, on the briefs, for plaintiff-appellee Del Monte Fresh Produce (Hawaii) Inc.

MOON, C.J., LEVINSON, and NAKAYAMA, JJ., and ACOBA, J., concurring separately, with whom DUFFY, J., joins.

Opinion of the Court by NAKAYAMA, J.

Defendant–Appellant Fireman's Fund Insurance Company ("Fireman's Fund"), appeals from the order of the Circuit Court of the First Circuit ("circuit court") filed August 29, 2001, granting partial summary judgment in favor of Plaintiff–Appellee Del Monte Fresh Produce (Hawai'i), Inc. ("Del Monte Fresh"), and denying Fireman's Fund's motions for summary judgment.[1] On appeal, Fireman's Fund presents the following points of error: (1) the circuit court erred when it chose to apply the law of Hawai'i rather than California; (2) even assuming, *arguendo*, that Hawai'i law applies, the circuit court misapplied this court's jurisprudence relating to insurance contracts; (3) the circuit court misinterpreted and misapplied the word "suits" in its insurance policies when it determined that Fireman's Fund owed a duty to defend to Del Monte Fresh; and (4) the circuit court erred when it determined that Fireman's Fund owed a duty to indemnify on the basis that costs incurred in administrative proceedings are covered under the insurance policy as "damages."

Defendants–Appellants American Home Assurance Company ("American Home"),

---

1. The Honorable Gary W.B. Chang presided.

Lexington Insurance Company ("Lexington"), American Re–Insurance Company ("American Re–Insurance"), Commercial Union Insurance Company ("Commercial Union"), London Market Insurers, Motor Vehicle Casualty Company ("Motor Vehicle"), and National Continental Insurance Company ("National Continental") appeal from the circuit court's separate August 29, 2001 order denying their joinders in Fireman's Fund's motions for summary judgment. On appeal, these remaining insurers essentially reiterate the points of error raised by Fireman's Fund, with London Market Insurers, National Continental, Commercial Union, and American Re–Insurance additionally asserting that, as excess liability insurers, providing coverage is contingent upon the primary insurers' responsibility to provide and exhaust their coverages under their respective policies.

For the following reasons, we hold that the circuit court erred when it determined that insurance coverage was assigned by operation of law to Del Monte Fresh. We also hold that the assignment by contract was invalid inasmuch as none of the insurers consented to the assignment. Accordingly, the circuit court's August 29, 2001 orders are vacated, and the case is remanded with instructions to enter summary judgment in favor of Defendant–Appellant insurers and against Del Monte Fresh consistent with this opinion.

## I.  BACKGROUND

### A.  Factual Background

#### 1.  Corporate history

In the 1940s, California Packing Corporation began pineapple growing operations on the island of O'ahu,. Hawai'i. California Packing Corporation renamed itself Del Monte Corporation in 1967. In February 1979, Del Monte Corporation merged with R.J. Reynolds Merger Corp. (a subsidiary of R.J. Reynolds Industries, Inc.), pursuant to a Plan of Merger dated November 3, 1978. The surviving corporation, R.J. Reynolds Merger Corp., renamed itself Del Monte Corporation ("Del Monte Corp.") immediately following the transaction.

Pursuant to a stock and asset purchase agreement dated August 23, 1989, Del Monte Corp. agreed to sell various of its subsidiary fruit companies along with its operations in Hawai'i to Profwheel B.V. (a Dutch corporation owned by Polly Peck International PLC, an English corporation). On October 11, 1989, PPI Del Monte Fresh Produce (Hawaii) Inc. ("PPI–Del Monte Fresh") was incorporated in Delaware. Through a Bill of Sale and Assumption Agreement executed on October 17, 1989, Del Monte Corp. and its corporate parents transferred the assets and liabilities associated with its Hawai'i operations to PPI–Del Monte Fresh. PPI–Del Monte Fresh removed the "PPI" prefix from its corporate name on October 14, 1992.

#### 2.  The EPA's "special notice letter"

From the early 1940s to at least 1978, Del Monte Corp. and its predecessors owned and operated a six-thousand acre pineapple plantation located in Kunia on the island of O'ahu, Hawai'i. At the time of commencement of the instant case, this land was operated by Del Monte Fresh. In 1994, this land was placed on the U.S. Environmental Protection Agency's ("EPA") National Priorities List of contaminated sites after an EPA investigation revealed that the land had been contaminated with fumigants.

This investigation revealed that on April 7, 1977, a "trailer-type container owned by [Dow Chemical Company]" delivered the fumigant ethylene dibromide to Del Monte Corp., which reportedly may have been contaminated with dibromo–3–chloropropane. While the fumigant was being transferred from a "trailer-type container" to the on-site storage through a connecting hose, the connection broke or ruptured. The EPA determined that this caused the release of hundreds of gallons of fumigant into the soil located in the area on the plantation known as Kunia Camp, which is in the vicinity of a drinking water well known as the Kunia Camp Well. The EPA further noted that "[o]ther releases of fumigants to the soils are believed to have occurred over time at the Site, during transfer of fumigant from bulk storage to supply trucks."

On April 14, 1980, the EPA collected groundwater samples from the Kunia Camp Well. Testing of the water samples indicated that the water contained both fumigant and contaminant in levels exceeding federal and state limits. Additionally, testing of the soil by the EPA in the vicinity of the storage area resulted in the same conclusion. On April 25, 1980, the Kunia Camp Well was disconnected from the potable water system.

On April 28, 1995, the EPA issued a "special notice letter" to Del Monte Fresh as a "potentially responsible party" under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA").[2] In a separate "special notice letter" dated on the same day, the EPA also named Del Monte Corp. as a "potentially responsible party." EPA asserted that Del Monte Fresh was liable for cleanup of the site, for reimbursement of the costs of the EPA investigation, and for conducting a remedial investigation and feasibility study.[3] Del Monte Fresh responded to the EPA and, in September 1995, entered into an "Administrative Consent Order" with both the EPA and the State of Hawai'i, whereby Del Monte Fresh agreed to undertake the remedial investigation and feasibility study. Following its receipt of the EPA's "special notice letter," Del Monte Fresh tendered the defense of the EPA claim to all liability insurers of the Kunia land since the 1940s. Most of the insurers denied coverage.

### 3. The insurers

There are several insurers whose policies are relevant to the instant appeal. It is undisputed that the insurance policies in the instant case contain a no assignment clause that requires the consent of the insurer to bind it to any assignment made by Del Monte Corp., who is the named insured.[4] It is further undisputed that all insurance policies were in effect but expired prior to the 1989 sale.

Primary liability insurance was provided by both Fireman's Fund and American Home. The relevant Fireman's Fund's policies provided continuous coverage to Del Monte Corp. as the named insured from May 31, 1969, until May 31, 1978. American Home provided primary liability insurance naming Del Monte Corp. as the named insured from March 1, 1982, until May 1, 1986.

American Home also provided excess liability insurance coverage to Del Monte Corp. between March 1, 1982, and December 31, 1985. Excess liability insurance was provided to Del Monte Corp. by the remaining Defendant–Appellant insurers during different periods of time between 1967 and 1982.[5]

### B. Procedural Background

On August 13, 1997, Del Monte Fresh filed a complaint in circuit court seeking, *inter alia*, a judicial declaration that numerous insurers owed it duties to defend and indemnify in the EPA investigation.

---

2. *See* 42 U.S.C. §§ 9601–9675 (2000).

3. The EPA noted in its "special notice letter" that it had incurred $80,622.60 in estimated response costs related to the Kunia site, and also that it intended to conduct a "Remedial Investigation/Feasibility Study" of the site, where Del Monte and the other potentially responsible parties were "invited" to participate. This invitation was to "conduct or finance" the analyses required for site remediation. The EPA demanded payment for the aforementioned $80,622.60 of costs it had incurred, and put the potentially responsible parties on notice that they were "potentially liable for all expenditures plus interest" with respect to any additional costs the EPA would incur in the future. The EPA notice stated that if the potentially responsible parties did not respond, the EPA had the ability to, *inter alia*, (1) unilaterally order the potentially responsible parties to perform the remediation analysis, or (2)

bring civil suit against the potentially responsible parties.

4. The parties do not dispute that Del Monte Corp. was the named insured on all relevant insurance policies.

5. Specifically, remaining Defendant–Appellant insurers admit that coverage was provided between the following time periods: (1) London Market Insurers between 1967 and 1979; (2) Commercial Union between February 28, 1970, and February 28, 1973; (3) American Re–Insurance between March 10, 1975, and May 31, 1977; (4) National Continental between August 31, 1970, and August 31, 1973, as well as between September 29, 1973, and September 29, 1976; (5) Lexington Insurance Company between September 29, 1976, and September 29, 1979; and (6) Motor Vehicle between September 29, 1979, and September 29, 1982.

On May 10, 2001, Fireman's Fund filed a motion for summary judgment asserting that Del Monte Fresh was not an insured under the terms of its policies. Fireman's Fund filed a second motion for summary judgment on May 10, 2001, claiming that there was no "suit" and also no "legal damages" that would serve to trigger coverage for the benefit of Del Monte Fresh under its policies. All other defendant-appellant insurers filed substantive joinders in Fireman's Fund's motions for summary judgment. Del Monte Fresh responded with corresponding cross-motions for summary judgment.

The circuit court granted Del Monte Fresh's cross-motions for summary judgment and orally explained its reasoning at a hearing held on August 6, 2001.[6] In particular, the circuit court expressed the following conclusions: (1) "believe[d] it's not necessary really to make a formal finding on the conflict of law issue[ ]"; (2) determined that "some or all of the claims ... for which [Del Monte] is seeking coverage[ ] arose at the time when Del Monte [Corp.] was the insured and ... arose under [Del Monte Corp.'s] watch[ ]"; (3) "where a successor corporation seeks coverage and that coverage really does not increase the risk to the [insurance] carrier, then by operation of law, coverage should be extended to the [claimant][ ]"; (4) pursuant to *Henkel Corp. v. Hartford Accident and Indemnity Co.*, 88 Cal.App.4th 876, 106 Cal.Rptr.2d 341 (2001), *rev'd*, 29 Cal.4th 934, 62 P.3d 69, 129 Cal. Rptr.2d 828 (2003),[7] and *Northern Ins. Co. of New York v. Allied Mut. Ins. Co.*, 955 F.2d 1353 (9th Cir.1992), the insurer's policies

were assigned to Del Monte Fresh from Del Monte Corp. by operation of law; and (5) the Defendant–Appellant insurers had a duty to defend and indemnify Del Monte Fresh inasmuch as (a) there was "some level of ambiguity" as to the term "suit," (b) "[t]he [EPA] proceedings ... are largely the functional equivalent of civil actions [and] take on all the characteristics and obligations of those of a lawsuit[,]" such that "those ... administrative matters[ ] are law suits," and (c) "the term 'suit' is not limited to civil actions only and the word 'damages' is not limited to compensation awarded in a civil action."

The circuit court issued two orders on August 29, 2001. The first order denied Fireman's Fund's two motions for summary judgment and granted Del Monte Fresh's two corresponding cross-motions on the "not an insured," "no suit," and "no legal damages" issues. The second order denied all joinders in Fireman's Fund's motions, except as to Commercial Union's regarding the duty to defend issue.[8] On October 24, 2001, the circuit court certified the first summary judgment order for appeal pursuant to Hawai'i Revised Statutes (HRS) § 641–1(b) (1993).[9] Certification of the second summary judgment order for appeal followed on October 25, 2001. All Defendant–Appellant insurers filed timely notices of appeal on October 25 and 26, 2001.

## III. STANDARDS OF REVIEW

### A. Summary Judgment

On appeal, the grant or denial of summary judgment is reviewed *de novo*. *See*

---

6. The circuit court's August 29, 2001 written order denying Fireman's Fund's motions for summary judgment and granting Del Monte's cross-motions for summary judgment did not contain any reasoning.

7. At the time of the circuit court's ruling, *Henkel* was pending appeal in the Supreme Court of California.

8. The circuit court expressly declined to rule on the issue because it was informed that the parties were attempting to negotiate an agreement on that issue. However, it appears that no agreement was reached because Commercial Union is asserting in its points of error that the circuit court erred in its resolution of the duty to defend issue.

9. Hawai'i Revised Statutes ("HRS") § 641–1(b) (1993) provides:

> Upon application made within the time provided by the rules of court, an appeal in a civil matter may be allowed by a circuit court in its discretion from an order denying a motion to dismiss or from any interlocutory judgment, order, or decree whenever the circuit court may think the same advisable for the speedy termination of litigation before it. The refusal of the circuit court to allow an appeal from an interlocutory judgment, order, or decree shall not be reviewable by any other court.

This text was unchanged by the 2004 amendment to HRS § 641–1.

*State ex. rel. Anzai v. City and County of Honolulu,* 99 Hawai'i 508, 514, 57 P.3d 433, 439 (2002); *Bitney v. Honolulu Police Dep't,* 96 Hawai'i 243, 250, 30 P.3d 257, 264 (2001).

[S]ummary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties. The evidence must be viewed in the light most favorable to the non-moving party. In other words, we must view all of the evidence and inferences drawn therefrom in the light most favorable to the party opposing the motion.

*Kahale v. City and County of Honolulu,* 104 Hawai'i 341, 344, 90 P.3d 233, 236 (2004) (citation omitted).

## B. Interpretation of Insurance Policies

Regarding interpretation of insurance policies, this court has stated:

[I]nsurers have the same rights as individuals to limit their liability and to impose whatever conditions they please on their obligation, provided they are not in contravention of statutory inhibitions or public policy. As such, insurance policies are subject to the general rules of contract construction; the terms of the policy should be interpreted according to their plain, ordinary, and accepted sense in common speech unless it appears from the policy that a different meaning is intended. Moreover, every insurance contract shall be construed according to the entirety of its terms and conditions as set forth in the policy.

Nevertheless, adherence to the plain language and literal meaning of insurance contract provisions is not without limitation. We have acknowledged that because insurance policies are contracts of adhesion and are premised on standard forms prepared by the insurer's attorneys, we have long subscribed to the principle that they must be construed liberally in favor of the insured and any ambiguities must be resolved against the insurer. Put another way, the rule is that policies are to be construed in accord with the reasonable expectations of a layperson.

*Dairy Rd. Partners v. Island Ins. Co., Ltd.,* 92 Hawai'i 398, 411–12, 992 P.2d 93, 106–07 (2000) (citations, quotation marks, and brackets omitted).

## C. Statutory Interpretation

Regarding statutory interpretation, this court has stated:

First, the fundamental starting point for statutory interpretation is the language of the statute itself. Second, where the statutory language is plain and unambiguous, our sole duty is to give effect to its plain and obvious meaning. Third, implicit in the task of statutory construction is our foremost obligation to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. Fourth, when there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists. And fifth, in construing an ambiguous statute, the meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning.

*Awakuni v. Awana,* 115 Hawai'i 126, 133, 165 P.3d 1027, 1034 (2007) (citation omitted).

## D. Choice of Law

This court has recently stated that "[t]he question of the choice of law to be applied in a case is a question of law reviewable *de novo* [.] ... Therefore, a choice of law issue is a question of law we review under the right/wrong standard." *Mikelson v. United States Auto. Ass'n,* 107 Hawai'i 192, 197, 111 P.3d 601, 606 (2005) (quoting and citing *Jenkins v. Whittaker Corp.,* 785 F.2d 720, 724 (9th Cir. 1986)) (quotation marks, brackets, and other citations omitted).

## IV. DISCUSSION

### A. Hawai'i Law Applies To the Instant Case.

This court discussed its choice of law jurisprudence in *Mikelson*, which was decided after the appellate briefs in the instant appeal were filed. Therein this court observed the following:

> This court has moved away from the traditional and rigid conflict-of-laws rules in favor of the modern trend towards a more flexible approach looking to the state with the most significant relationship to the parties and subject matter. This flexible approach places primary emphasis on deciding which state would have the strongest interest in seeing its laws applied to the particular case. Hence, this court has said that the interests of the states and applicable public policy reasons should determine whether Hawai'i law or another state's law should apply. "The preferred analysis ... would be an assessment of the interests and policy factors involved with a purpose of arriving at a desirable result in each situation."

*Mikelson*, 107 Hawai'i at 198, 111 P.3d at 607 (citations, brackets, and some quotation marks omitted).

In light of this court's discussion in *Mikelson*, Fireman's Fund's reliance on *P.W. Stephens Contractors, Inc. v. Mid American Indem. Ins. Co.*, 805 F.Supp. 854 (D.Haw. 1992), *Airgo, Inc. v. Horizon Cargo Transp.*, 66 Haw. 590, 670 P.2d 1277, 1281 (1983), and *California Fed. Sav. & Loan Ass'n v. Bell*, 6 Haw.App. 597, 735 P.2d 499 (1987), for the proposition that Hawai'i courts have consistently applied the factors set forth in the Restatement (Second) of Conflict of Laws § 188 (2001)[10] when confronted with a conflict between the law of Hawaii and that of another state is not persuasive. First, Fireman's Fund's reading of *P.W. Stephens* is inaccurate because the federal court clearly observed that this court "look[ed] to but reject[ed] the [Restatement (Second)] approach" in *Peters v. Peters*, 63 Haw. 653, 634 P.2d 586 (1981). *P.W. Stephens*, 805 F.Supp. at 856. Second, Fireman's Fund's reading of *Bell* is also inaccurate inasmuch as the ICA in *Bell* did not rely on any provision of the Restatement (Second) of Conflict of Laws in making its choice of law decision. *See Mikelson*, 107 Hawai'i at 201, 111 P.3d at 610 ("While the [ICA] made reference to the Restatement in [*Bell*], the ICA decided the underlying choice of law issue utilizing Professor Leflar's 'choice-influencing considerations' approach referred to in *Peters*."); *Bell*, 6 Haw.App. at 606, 735 P.2d at 505 (applying "Professor Leflar's 'choice-influencing considerations'" approach).

Finally, the parties in *Airgo* "*expressly agreed* in both service agreements that any disputes were to be resolved under Texas law." *Id.* at 595, 670 P.2d at 1281 (emphasis added). In *Airgo*, this court was guided by the Restatement (Second) of Conflict of Laws § 187(1) (1971)[11] for the proposition that a choice of law provision provided in a contract between the parties will generally be upheld "[w]hen ... the chosen law has some nexus with the parties or the contract[.]" *Airgo*, 66

---

10. Restatement (Second) of Conflict of Laws § 188 provides, in pertinent part:

    (1) The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties....

    (2) In the absence of an effective choice of law by the parties ... the contacts to be taken into account ... to determine the law applicable to an issue include:
    (a) the place of contracting,
    (b) the place of negotiation of the contract,
    (c) the place of performance,
    (d) the location of the subject matter of the contract, and
    (e) the domicil, residence, nationality, place of incorporation and place of business of the parties.
    These contacts are to be evaluated according to their relative importance with respect to the particular issue.

11. Restatement (Second) of Conflict of Laws § 187(1) provides:

    § 187. Law Of The State Chosen By The Parties
    (1) The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue.

Haw. at 595, 670 P.2d at 1281. However, because none of the insurance policies in the instant case contain a choice of law provision, *Airgo* is distinguishable.[12]

■ In applying the approach articulated by this court in *Mikelson*, we hold that Hawai'i has a greater interest in applying its own law to the instant case for the following reasons. First, the environmental pollution that engendered the instant case occurred on land located in Hawai'i. Second, the Hawai'i State Department of Health is overseeing the Kunia plantation site remediation, having (1) entered into a separate memorandum agreement with the EPA, and (2) concurred in the EPA/Del Monte Fresh consent order such that it will not pursue its own available remedies against Del Monte Fresh so long as it continues with its site remediation. Finally, the State of Hawai'i has expressed an interest in favor of protecting its environment for the public's welfare. HRS § 341–1 (1993) provides, in pertinent part:

> *The legislature finds that the quality of the environment is as important to the welfare of the people of Hawaii as is the economy of the State.* The legislature further finds that the determination of an optimum balance between economic development and environmental quality deserves the *most thoughtful consideration, and that the maintenance of the optimum quality of the environment deserves the most intensive care.*

(Emphases added.)

In light of the above interests, we hold that Hawai'i law applies to the instant case.

## B. The Circuit Court Erred When It Determined That Insurance Coverage Was Assigned From Del Monte Corp. to Del Monte Fresh By Operation Of Law.

The threshold issue is whether a valid assignment was either expressly made or effected by operation of law that placed Del Monte Fresh as an insured under the insurance policies in effect prior to the 1989 sale. The circuit court ruled in pertinent part:

> [THE COURT]: ... There are basically two approaches that courts take when construing insurance policies. One is a strict construction approach and the other is a more liberal type of approach where the court considers various factors, including the effect of law upon the contract.
>
> This court has always been of the mind that when the reason for the rule ceases, the rule itself should also cease. And applying that approach to the issues in this case, the court looked heavily as to what the insurance carrier was trying to accomplish when it drafted the contract and really, the provisions requiring the claimant to be an insured and the non-assignment provisions are really designed to limit the risk to the carrier and try to avoid unanticipated risk to the carrier.
>
> ... [W]e have a situation here where some or all of the claims that ... Del Monte Fresh is seeking coverage[ ] arose at the time when Del Monte [Corp.] was the insured and it arose under Del Monte [Corp.'s] watch. And I make particular reference to the most recent *Henkel* case.
>
> And I think that applying the reason for the rule logic, that case took on greater appeal to this court and so what this court

12. Pursuant to the Restatement (Second), Fireman's Fund argues that California law applies to the instant case because (1) all of the contracting parties to the insurance policies were located in California, (2) the policies were negotiated in California, (3) the insurance contract would be "perform[ed]" in California by Fireman's Fund in the event that policy benefits were provided, (4) Del Monte Fresh tendered claims to Fireman's Fund in California, and (5) California was the principal place of business for all contracting parties. This argument is without merit because the Restatement (Second) itself provides that the rights created by an insurance contract "are de-termined by the local law of the state which the parties understood was to be the *principal location of the insured risk* during the term of the policy, unless with respect to the particular issue, some other state has a more significant relationship...." Restatement (Second) of Conflict of Laws § 193 (emphasis added); *see P.W. Stephens Contractors*, 805 F.Supp. at 856 ("The place of contracting is relatively insignificant when there is no other significant relationship between the transaction and that place."). No other significant relationship between California and the instant case has been asserted by Fireman's Fund.

concludes is that *where a successor corporation seeks coverage and that coverage really does not increase the risk to the carrier, then by operation of law, coverage should be extended to the plaintiff.*

Where, however, the successor corporation engages in conduct that increases the risk, that is, exposes the carrier to risks that were not in existence when the insured was—before the successor corporation was created, then you have the situation where there is unanticipated risk and therefore, the definition of an insured and the non-assignment provisions then become very critical to limiting the exposure to the carrier.

And it is primarily for this reason that the court is going to follow, in this case, the *Henkel* and *Northern Insurance* cases rather than the *Quemetco* and *General Accident* cases. For this reason, the court is going to deny Fireman's Fund's motion for summary judgment and grant Del Monte Fresh's cross motion for summary judgment with the express intention of entitling Del Monte Fresh to a defense for the 1995 E.P.A. administrative claim.

(Emphasis added.)

*Northern Insurance* concerned a dispute between two insurers, Northern Insurance and Allied Mutual Insurance Company, wherein Northern Insurance sought contribution from Allied Mutual for defense costs incurred by Brown–Forman Corp. in a products liability tort action. 955 F.2d at 1355–56. The coverage action was tied to the gestation of a child who was born with fetal alcohol syndrome in October 1983. *Id.* The child's parents brought suit in November 1987, alleging that the mother's consumption of California Coolers during her pregnancy resulted in the child's suffering from fetal alcohol syndrome. *Id.* at 1356. Brown–Forman purchased California Cooler in July 1985, through an asset purchase agreement that, *inter alia*, "excluded from the sale the assignment of any contract that required consent to assign." *Id.* at 1355–56. Brown–Forman made tenders of defense to both Northern Insurance and Allied Mutual. *Id.* at 1356.

On appeal, the Ninth Circuit held that even though the asset purchase agreement did not serve to assign Allied Mutual's liability policy to Brown–Forman Corp., the policy benefits were transferred to Brown–Forman by operation of law. *Id.* at 1357. Specifically, it held that as to "presale occurrences," Allied Mutual's policy benefits, "including the right to a defense, transferred by operation of law to Brown–Forman when [it] purchased substantially all of California Cooler's assets." *Id.* at 1358. It observed that California follows the tort rule of "product-line successor liability[,]" under which "a purchaser of substantially all assets of a firm assumes, with some limitations, the obligation of product liability claims arising from the selling firm's presale activities. Liability is transferred irrespective of any clauses to the contrary in the asset purchase agreement." *Id.* at 1357 (citing, *inter alia*, *Ray v. Alad Corp.*, 19 Cal.3d 22, 34, 560 P.2d 3, 11, 136 Cal.Rptr. 574, 582 (1977) (holding that "a party which acquires a manufacturing business and continues the output of its line of products under the circumstances here presented assumes strict tort liability for defects in units of the same product line previously manufactured and distributed by the entity from which the business was acquired")). Because tort liability transfers from the predecessor company to the successor, the Ninth Circuit ultimately concluded that the right to a defense transfers as well. *See id.* at 1358 ("We agree with the [Eighth Circuit in *Ocean Accident & Guar. Co. v. Sw. Bell Tel. Co.*, 100 F.2d 441 (8th Cir.1939), *cert. denied*, 306 U.S. 658, 59 S.Ct. 775, 83 L.Ed. 1056 (1939),] that the rationale for honoring 'no assignment' clauses vanishes when liability arises from presale activity.").

Insurers take account of the nature of the insured when issuing a policy. Risk characteristics of the insured determine whether the insurer will provide coverage, and at what rate. An assignment could alter drastically the insurer's exposure depending on the nature of the new insured. "No assignment" clauses protect against any such unforeseen increase in risk. When the loss occurs before the transfer, however, the characteristics of the successor are of little importance: regardless of any

transfer the insurer still covers only the risk it evaluated when it wrote the policy. *Id.* (citation omitted).

However, a California appellate court disagreed with the Ninth Circuit's analysis and application of California law. In *General Accident Insurance Co. of America v. Superior Court*, 55 Cal.App.4th 1444, 1445–46, 64 Cal.Rptr.2d 781, 782–83 (1997), Western MacArthur Company, an asbestos distribution company that had taken over Western Asbestos Company, sought a declaratory judgment that certain insurers owed it duties of defense and indemnification. Western MacArthur operated in essentially the same manner as Western Asbestos post-takeover, retaining almost all of the same employees, distributing the same products, and owning Western Asbestos' customer lists and corporate goodwill. *Id.* at 1446–47, 64 Cal.Rptr.2d at 783–84.

In the underlying case giving rise to *General Accident*, Western MacArthur was found liable under the successor liability rule for Western Asbestos' product liabilities, which led to the filing of thousands of asbestos lawsuits against Western MacArthur due to its predecessor's products. *Id.* at 1447–48, 64 Cal.Rptr.2d at 783. Western MacArthur's own coverage limits under its liability insurance policy was eventually exhausted. *Id.* at 1448, 64 Cal.Rptr.2d at 783. At that point, Western MacArthur attempted to call upon insurance policies issued to Western Asbestos. *Id.* Because Western MacArthur was not a named insured under any of these policies, the insurers denied coverage. *Id.* at 1448, 64 Cal.Rptr.2d at 783–84.

The insurers moved for summary judgment, arguing that they and Western MacArthur shared no "insured-insurer contractual relationship[,]" and also that "Western Asbestos' insurance coverage did not transfer to Western MacArthur by operation of law by virtue of the finding of successor liability [in the underlying case]." *Id.* at 1449, 64 Cal. Rptr.2d at 784. In response, Western MacArthur contended, *inter alia*, that "the insurance policies were transferred by operation of law[,]" and alternatively, "there was an express assignment of the Western Asbestos policies" pursuant to a security agreement

between the two companies. *Id.* The trial court denied summary judgment, relying on *Northern Insurance* "for the proposition that '[t]he benefits of a predecessor's insurance policy may transfer as a matter of law to a successor corporation if liability for a predecessor's activity transferred as a matter of law under a product liability successor theory.' " *Id.*

On appeal, the appellate court disagreed with and declined to follow *Northern Insurance*. *Id.* "[T]he finding of successor liability in tort does not entitle the successor corporation, by operation of law, to the insurance coverage of its corporate predecessor." *Id.* at 1454, 64 Cal.Rptr.2d 781, 64 Cal.Rptr.2d at 788. After discussing both *Northern Insurance* and *Ocean Accident*, the court opined that the principles of *Ocean Accident* "[did] not provide authority for the *Northern Insurance* proposition that insurance coverage transfers by operation of law by the finding of successor liability for product liability torts[,]" inasmuch as *Northern Insurance* improperly intermingled *Ocean Accident's* contract principles with the tort of successor liability. *Id.* at 1450–51, 64 Cal.Rptr.2d at 785 (concluding that unlike *Northern Insurance, Ocean Accident* involved an express assignment of an insurance policy by the predecessor corporation to its successor, and the underlying issue was whether the policy's "no assignment" clause, which required the consent of the insurer, was applicable to a loss that preceded the assignment).

> An insured-insurer relationship is a matter of contract. Successor liability is a matter of tort duty and liability. It is one thing to deem the successor corporation liable for the predecessor's torts; it is quite another to deem the successor corporation a party to insurance contracts it never signed, and for which it never paid a premium, and to deem the insurer to be in a contractual relationship with a stranger.

*Id.* at 1451, 64 Cal.Rptr.2d at 785; *see Red Arrow Prod.'s Co., Inc. v. Employers Ins. Co. of Wausau*, 233 Wis.2d 114, 607 N.W.2d 294, 301 (Ct.App.2000) ("The successor liability rule was intended to protect an individual who, not being in a contractual relationship with a manufacturer, cannot otherwise pro-

tect himself or herself from an injury arising from a product manufactured by a company that no longer exists."). The court thus concluded that "a transfer by operation of law is a violation of the basic principles of contract and is also bad public policy." *Id.* at 1454, 64 Cal.Rptr.2d at 788.

■ It is well settled in Hawai'i that "[t]he objectively reasonable expectations of [policyholders] and intended beneficiaries regarding the terms of insurance contracts will be honored even though painstaking study of the policy provisions would have negated those expectations." *Hawaiian Ins. & Guar. Co. v. Brooks,* 67 Haw. 285, 290–91, 686 P.2d 23, 27 (1984) (alterations in original) (citations and quotation marks omitted), *overruled on other grounds, Dairy Rd. Partners,* 92 Hawai'i 398, 992 P.2d 93. These "reasonable expectations" are derived from the insurance policy itself, which is "subject to the general rules of contract construction[.]" *Dairy Rd. Partners,* 92 Hawai'i at 411, 992 P.2d at 106. This involves construing the policy "according to the entirety of its terms and conditions[,]" and "the terms [themselves] ... should be interpreted according to their plain, ordinary, and accepted sense in common speech unless it appears from the policy that a different meaning was intended." *Id.* (brackets omitted). "[B]ecause insurance policies are contracts of adhesion and are premised on standard forms pre-pared by the insurer's attorneys, we have long subscribed to the principle that they must be construed liberally in favor of the insured and any ambiguities must be resolved against the insurer." *Id.* at 411–12, 992 P.2d at 106–07 (citation, quotation marks, and some brackets omitted).

■ The foregoing common law framework is consistent with the plain language of HRS § 431:10–237 (2005), which mandates that "[e]very insurance contract shall be construed according to the entirety of its terms and conditions as set forth in the policy, and as amplified, extended, restricted, or modified by any rider, endorsement or application attached to and made a part of the policy." Furthermore, pursuant to language unchanged from its enactment in 1987, HRS § 431:10–228(a) [13] clearly provides that "[a] policy may be assignable or not assignable, *as provided by its terms.*" (Emphasis added.) Because Hawai'i law requires every insurance policy to be subject to the general rules of contract construction, *see* HRS § 431:10–237, and an assignment by operation of law is merely an extension of the common law tort rule of successor liability, *see Northern Insurance,* 955 F.2d at 1358, we hold the circuit court erred when it concluded that an assignment by operation of law is consistent with Hawaii's rules governing construction of insurance policies.[14]

---

13. HRS § 431:10–228 provides, in its entirety:
(a) A policy may be assignable or not assignable, as provided by its terms.
(b) Subject to the terms of the policy, any policy providing the beneficiary may be changed upon the sole request of the insured, may be assigned by either pledge or transfer of title, executed by the insured alone, and delivered to the insurer, regardless of whether the insured is the pledgee or assignee. Any such assignment shall entitle the insurer to deal with the assignee as the owner or pledgee of the policy in accordance with the terms of the assignment until the insurer has received at its home office written notice of termination of the assignment or pledge, or written notice by or on behalf of some other person claiming some interest in the policy in conflict with the assignment.

14. The concurrence points out that "several courts have given great weight to timing, i.e., whether CERCLA was in effect when the policies were issued such that the insurer could have considered potential risks under CERCLA."

Concurring opinion at 11–12. Although this is true, it has also been held that the more germane consideration is whether an insurable loss existed, notwithstanding the point in time a particular environmental statute was enacted. *See Minnesota Mining & Mfg. Co. v. Travelers Indem. Co.,* 457 N.W.2d 175, 183 (Minn.1990) ("The issue of coverage does not depend merely on the form of action taken against the insured.... [T]he parties in these cases were aware of the potential liability for groundwater contamination at the time they entered [into] the insurance policies at issue.... The advent of [the Minnesota Environmental Response Liability Act ('MERLA')] and other environmental statutes have merely changed the form of the liability for groundwater pollution, not the nature of that liability."); *Gopher Oil Co. v. Am. Hardware Mut. Ins. Co.,* 588 N.W.2d 756, 764 (Minn.Ct.App.1999) ("[A] loss occurs at the time of contamination, even if the claim is brought under subsequently enacted legislation. *Minnesota Mining & Mfg.,* 457 N.W.2d at 183 (recognizing longstanding prohibition of contamination of groundwater predating CERC-

## C. The Assignment By Contract Was Invalid Because Del Monte Corp. Failed To Obtain Its Insurers' Consent Pursuant To the Terms Of the Insurance Policies.

The pertinent language contained in the Bill of Sale that transferred Del Monte Corp.'s assets to Del Monte Fresh is as follows:

2. [Del Monte Corp.] hereby conveys, assigns, transfers and delivers to [PPI–Del Monte], all of its right, title and interest in and to all the Assets, subject to the related liabilities, as the same shall exist on the date hereof. The Assets shall include all of the properties and assets (real and personal, tangible and intangible) of [Del Monte Corp.] constituting a part of, used in, arising out of or pertaining or relating in any manner whatsoever to the business of the Del Monte Tropical Fruit Division located in Hawaii (the "Hawaiian Business") of every nature, kind, character, description, absolute, contingent and otherwise, wherever located or situated, including, without limitation, . . . (B) any and all other assets of the Hawaiian Business, *including, without limitation, . . . any . . . insurance policies of the Hawaiian Business, any causes of action, judgments, claims, and demands of whatever nature of the Hawaiian Business* [.]

(Emphasis added.)

The pertinent language contained in the Assumption Agreement that transferred Del Monte Corp.'s liabilities to Del Monte Fresh is as follows:

1. [Del Monte Fresh] hereby undertakes, assumes and agrees to perform, pay or discharge when due, to the extent not heretofore performed, paid or discharged, and subject to the limitations contained in

Paragraph 2 hereof: . . . (vi) all liabilities and obligations arising out of and relating to the operations of the Hawaiian Business, *including, without limitation, any and all contingent liabilities related to the contamination of ground water or the use heptachlor*[.]

(Emphasis added.)

■ Del Monte Fresh points out that it is not arguing that the insurance policies were assigned to it as a result of the above agreements. Del Monte Fresh instead asserts that Del Monte Corp.'s transfer of all assets and liabilities to it effectively assigned to Del Monte Fresh the right to claim and recover under Del Monte Corp.'s insurance policies in effect prior to the 1989 sale, notwithstanding the no assignment provisions in the policies.

It has been said that "insurance is a means of transferring the risk of loss from the insured to the insurance company. The insurance company is in the business of evaluating risks, assuming risks in return for periodic premiums, and spreading the costs of the risks." *Elliott v. Donahue*, 169 Wis.2d 310, 485 N.W.2d 403, 407 (1992) (footnote omitted). "In return for the premiums paid by the insured, the insurance company assumes the *contractual* duties of indemnification and defense for claims described in the policy." *Id.* (emphasis added).

■ In this regard, this court has stated that "insurance policies are subject to the general rules of contract construction[.] . . . [E]very insurance contract shall be construed according to the entirety of its terms and conditions as set forth in the policy." *Dairy Rd. Partners*, 92 Hawai'i at 411, 992 P.2d at 106 (brackets, quotation marks, and citations omitted). Accordingly, the duties to defend and indemnify arise under the terms of the insurance policy, and it is through an inter-

LA and MERLA)."). To consider timing assumes that liability could not be imposed under similar circumstances prior to the enactment of CERCLA.

Additionally, in the instant case, both American Home and Motor Vehicle provided liability insurance coverage to Del Monte Corp. after CERCLA was enacted. Specifically, primary liability insurance was provided by American Home from March 1, 1982, until May 1, 1986. Excess liability insurance coverage was also provided by

American Home between March 1, 1982, and December 31, 1985. Excess liability insurance was provided by Motor Vehicle between September 29, 1979, and September 29, 1982. Therefore, the concurrence's timing consideration is inapplicable as to them.

Nonetheless, we need not express an opinion as to what constitutes an insurable loss in light of HRS §§ 431:10–237 and 431:10–228(a) as applied to the facts and circumstances presented in this case.

pretation of the terms of the policy that such duties are deemed to be owed. *See Hawaiian Ins. & Guar. Co.*, 67 Haw. at 290–91, 686 P.2d at 27 ("[T]he objectively reasonable expectations of [policyholders] and intended beneficiaries *regarding the terms of insurance contracts* will be honored even though painstaking study of the policy provisions would have negated those expectations." (Alterations in original, emphasis added, and citations and quotation marks omitted)). Therefore, under Hawai'i law, it cannot be said, as Del Monte Fresh asserts, that the duties to defend and indemnify are separable from the terms of the insurance policy itself, and are assignable as such notwithstanding the existence of a no assignment provision.[15]

HRS § 431:10–228(a) provides that "[a] policy may be assignable or not assignable, as provided by its terms." Furthermore, this court has observed that "liability insurers have the same rights as individuals to limit their liability, *and to impose whatever conditions they please on their obligation,* provided they are not in contravention of statutory inhibitions or public policy." *First Ins. Co. of Hawaii, Inc. v. State of Hawaii,* 66 Haw. 413, 423, 665 P.2d 648, 655 (1983) (emphasis added) (citations and quotation marks omitted). The relevant insurance policies in the instant case contain a no assignment clause that requires the consent of the insurer to bind it to any assignment made by the named insured. It is undisputed that Del Monte Corp. is the only named insured covered by the policies. It is also undisputed that Del Monte Corp. did not obtain any of the insurers' consent prior to the 1989 assignment. Because the policies were assigned by Del Monte Corp. without the insurers' consent, we hold that Del Monte Fresh is not an insured under any of the Defendant–Appellant insurers' policies, and is therefore not owed duties to defend or indemnify by Defendant–Appellant insurers.[16]

## IV. CONCLUSION

Based upon the foregoing, the circuit court's August 29, 2001 orders are vacated, and the case is remanded with instructions to enter summary judgment in favor of Defendant–Appellant insurers and against Del Monte Fresh consistent with this opinion.

Concurring Opinion by ACOBA, J., with whom DUFFY, J., Joins.

I concur with the result in this case, but note my qualification to the majority's holding that the Circuit Court of the First Circuit (the court) "erred when it concluded that an assignment by operation of law is consistent with Hawaii's rules governing construction of insurance policies." Majority opinion at 368, 183 P.3d at 745. The majority's holding is premised on the determination that "an assignment by operation of law is merely an extension of the common law tort rule of successor liability"[1] that is superceded by the statutory mandate that insurance contracts are "subject to the general rules of contract construction." *Id.* at 368, 183 P.3d at 745 (citing Hawai'i Revised Statutes

15. Del Monte Fresh cites to numerous cases from other jurisdictions in support of its assertion that "courts have repeatedly enforced assignments of insurance claims to successor corporations," inasmuch as a liability that occurs prior to an assignment does not involve any increase in risk to the insurer. However, this argument is unpersuasive because it appears to be merely an extension of the rationale discussed and rejected, *supra*, in connection with the assignment-by-operation-of-law issue.

16. In light of the foregoing disposition, resolution of the remaining points of error raised by Fireman's Fund and other defendant-appellant insurers is unnecessary.

1. With all due respect, an assignment by operation of law is not an extension of successor liability but, rather, a consequence of it. *See N.*

*Ins. Co. of New York v. Allied Mut. Ins. Co.,* 955 F.2d 1353, 1358 (9th Cir.1992) (holding that "the benefits of [the disputed] policy, including the right to a defense, transferred by operation of law to [the successor] when [it] purchased substantially all of [the predecessor's] assets[,]" *i.e.,* when liability also transferred as a matter of law); *see also Gen. Accident Ins. Co. of Am. v.Super. Ct. of Alameda County,* 55 Cal.App.4th 1444, 64 Cal.Rptr.2d 781, 782 (1997) (holding that "a finding of successor liability in tort does not *create* from whole cloth an insurance relationship" (emphasis added)). Thus, successor liability may result in assignment of insurance coverage by operation of law, which could be appropriate in certain situations.

(HRS) § 431:10–237 (2005)).[2] However, an explicit conveyance by contract is but one way to transfer insurance benefits. Because transfer by operation of law is an alternative, equitable device by which a successor might obtain its predecessor's insurance benefits, analysis of the insurance contract language itself is not always dispositive.

## I.

There are situations in which a non-assignment clause is not applicable. For example, an anti-transfer clause may be ineffective, even if it is undisputed that the parties did not attempt to transfer the insurance policy by contract and that the insurer did not consent to any transfer, in a statutory merger. *Atlanta Gas Light Co. v. UGI Utils., Inc.*, No. 3:03–cv–614–J–20MMH, 2005 WL 5660476, *16, 2005 U.S. Dist. LEXIS 43592 at *53–55 (M.D.Fla.2005) (citing *Knoll Pharm. Co. v. Auto. Ins. Co. of Hartford*, 167 F.Supp.2d 1004 (N.D.Ill.2001), *aff'd in part, vacated in part by In re Synthroid Mktg. Litig.*, 264 F.3d 712 (7th Cir.2001); *Star Cellular Tel. Co. v. Baton Rouge CGSA, Inc.*, No. 12507, 1993 WL 294847 at *8, 1993 Del. Ch. LEXIS 158 (Del. Ch.1993) *aff'd*, 647 A.2d 382 (Del.1994); *Paxton & Vierling Steel Co. v. Great Am. Ins. Co.*, 497 F.Supp. 573 (D.Neb.1980); *Imperial Enter. v. Fireman's Fund Ins. Co.*, 535 F.2d 287 (5th Cir.1976)). Such a clause may also be inapplicable in products liability suits against a successor corporation, *see e.g., N. Ins.*, 955 F.2d at 1357–58; or where a successor corporation is liable for environmental contamination, *see e.g., Total Waste Mgmt. Corp. v. Commercial Union Ins. Co.*, 857 F.Supp. 140 (D.N.H. 1994) (insurance benefits transferred by operation of law when successor purchased assets in corporation responsible for environmental contamination); *Gopher Oil Co. v. Am. Hardware Mut. Ins. Co.*, 588 N.W.2d 756 (Minn.Ct.App.1999) (same).

Moreover, while the analysis of the insurance contract language itself is "subject to the general rules of contract construction[,]"

it must be tempered by the admonition that such contracts "must be construed liberally in favor of the insured and any ambiguities must be resolved against the insurer." *Dairy Rd. Partners v. Island Ins. Co.*, 92 Hawai'i 398, 411–12, 992 P.2d 93, 106–07 (2000) (citations and brackets omitted). Having determined that the insurance policies did not transfer to Plaintiff–Appellee Del Monte Fresh Produce (Hawaii), Inc. (DMF) through its contractual relationship with Del Monte Corporation (DMC), the next step is to determine whether they were conveyed under some other principle. *See Koppers Indus. v. N. River Ins. Co.*, No. 94–1706, 1996 WL 33577709, *5, 1996 U.S. Dist. LEXIS 22860 at *13–14 (W.D.Pa.1996), *aff'd*, 103 F.3d 113 (3d Cir.1996) (noting that "[h]aving held that [the successor] did not obtain an interest in the ... insurance policies by way of contract, the Court must go on to consider [its] arguments that such an interest was transferred by operation of law") (emphasis omitted). Thus, this appeal requires us to determine whether the law in this jurisdiction should allow for transfer of insurance policies by operation of law in the environmental contamination context. As discussed below, I would hold that the specific circumstances of this case militate against such a transfer. I would therefore reach the same result as the majority, holding that DMF is not entitled to insurance benefits under policies issued to its predecessors, California Packing Company (CPC) and DMC, but on different grounds.

## II.

## A.

The issue of whether an insurance policy has transferred by operation of law arises when a successor corporation is found to be liable for an obligation of its predecessor, the named insured. The common law rule of successor liability begins with the proposition that, in general, a successor corporation is

---

**2.** The portion of HRS § 431:10–237 quoted by the majority instructs that "[e]very insurance contract shall be construed according to the entirety of its terms and conditions as set forth in the policy, and as amplified, extended, restricted, or modified by any rider, endorsement or application attached to and made a part of the policy." This statute reiterates established precepts of construction and is not itself a prohibition to successor liability generally or specifically.

not liable for the debts and liabilities of its predecessor corporation. *Evanston Ins. Co. v. Luko,* 7 Haw.App. 520, 522, 783 P.2d 293, 295 (1989) (citing 19 Am.Jur.2d *Corporations* § 2704 at 513 (1986)) (noting the "general rule . . . that liability of a new corporation for the debts of another corporation does not result from the mere fact that the former is organized to succeed the latter" (internal quotation marks omitted)); *see also Koppers Indus.,* 1996 WL 33577709, *6, 1996 U.S. Dist. LEXIS 22860 at *17 (noting that "[a]s a general rule, when a company sells or transfers all of its assets to a successor company, the successor does not acquire the liabilities of the transferor corporation merely because of its succession to the transferor's assets" (citations and internal quotation marks omitted)); *B.S.B. Diversified Co. v. Am. Motorists Ins. Co.,* 947 F.Supp. 1476, 1479 (W.D.Wash.1996) (noting that "Washington law does not generally recognize that liability follows the purchase of corporate assets") (citation omitted). However, the common law recognizes exceptions to the general rule. *Evanston Ins.,* 7 Haw.App. at 522, 783 P.2d at 295. Specifically,

the transferee corporation may be held liable for the debts and liabilities of the transferor corporation when [ (1) ] there is an express or implied assumption of liability; [ (2) ] the transaction amounts to a consolidation or merger; [ (3) ] the transaction was fraudulent; [ (4) ] some of the elements of a purchase in good faith were lacking, as where the transfer was without consideration and the creditors of the transferor were not provided for; [or (5) ]

the transferee corporation was a mere continuation or reincarnation of the old corporation.

*Id.* at 523, 783 P.2d at 295–96 (citation omitted).[3]

The jurisprudence regarding exceptions to the general rule of successor non-liability is most robust in the area of products liability. *See, e.g., Savage Arms, Inc. v. W. Auto Supply Co.,* 18 P.3d 49, 51 (Alaska 2001) (holding successor corporation liable for injuries caused by defectively manufactured rifle); *Ray v. Alad Corp.,* 19 Cal.3d 22, 136 Cal. Rptr. 574, 560 P.2d 3, 5 (1977) (holding successor corporation liable for injuries caused by defectively manufactured ladder); *City of New York v. Aaer Sprayed Insulations, Inc.,* 281 A.D.2d 228, 722 N.Y.S.2d 20, 21 (N.Y.App.Div.2001) (holding that successor liability applied in suit seeking to recover cost of removing asbestos from government buildings); *Drexler v. Highlift, Inc.,* 277 A.D.2d 196, 715 N.Y.S.2d 722, 723 (2000) (reversing a grant of summary judgment in favor of defendant because "[a] corporation may have successor liability" for "injuries caused by defective products manufactured by its predecessor" under the four traditional exceptions); *Putt v. Yates–Am. Mach. Co.,* 722 A.2d 217, 224 (Pa.Super.Ct.1998) (imposing successor liability in products liability case where successor expressly assumed such liability).[4] However, the doctrine is not limited to products liability cases. *See A & R Teeters & Assocs. v. Eastman Kodak Co.,* 172 Ariz. 324, 836 P.2d 1034, 1039–41 (Ct. App.1992) (applying the four traditional fac-

---

**3.** Although the Intermediate Court of Appeals in *Evanston Insurance* seemed to recognize five exceptions to the general rule, "[t]here are four well-recognized exceptions," [hereinafter referred to as "the traditional exceptions"] including (1) assumption of obligations, (2) merger of the two corporations, (3) mere continuation of the predecessor, and (4) fraudulent transactions designed to escape liability. *Red Arrow Prods. Co., Inc. v. Employers Ins. of Wausau,* 233 Wis.2d 114, 607 N.W.2d 294, 300 n. 3 (Ct.App.2000) (citation omitted).

**4.** The theory of successor liability in products liability cases evolved to protect consumers who had no way to protect themselves from losing a cause of action when the producer of the dangerous product sold its assets to a new company.

As the Utah Court of Appeals explained, the rationales for imposing tort liability on a successor entity are that "[ (1) ] the buyer company is in a better position to bear the expense of the injury than the victim[, (2) ] . . . a manufacturer buyer is able to spread the cost of the injury to future consumers[, and (3) ] . . . because a manufacturer buyer profits from the predecessor's goodwill and reputation, it is unfair to allow the buyer to succeed to the seller for purposes of sales but not liability." *Decius v. Action Collection Serv. Inc.,* 105 P.3d 956, 960 (Utah App.2004), *cert. denied,* 124 P.3d 251 (Utah 2005) (internal citations omitted). If the successor company were not held liable for the products liability torts of the predecessor company, innocent consumers would be without recourse.

tors to determine if the successor corporation was liable for the predecessor's past due balances); *Bielagus v. EMRE of N.H. Corp.*, 149 N.H. 635, 826 A.2d 559, 570 (2003) (holding "that New Hampshire law recognizes the four traditional exceptions to the prohibition against imposing successor liability in commercial law").

### B.

Once liability has been imposed on a successor corporation for the deeds of its predecessor, the question of whether the predecessor's insurance covers the successor's liability arises. Courts holding that insurance policies transferred by operation of law in such cases reasoned that (1) the rationale for honoring non-assignment clauses did not apply when the liability arose from "pre-sale activity," *N. Ins.*, 955 F.2d at 1358 (citing *Ocean Accident & Guar. Corp. v. Southwestern Bell Tel. Co.*, 100 F.2d 441, 444 (8th Cir.1939)); *Total Waste Mgmt.*, 857 F.Supp. at 152 (finding *Northern Insurance* reasoning persuasive); (2) such a rule did not increase the risk to insurers, *Henkel Corp. v. Hartford Accident & Indem. Co.*, 106 Cal.Rptr.2d 341, 355 (Cal.Ct.App.2001) *rev'd* 29 Cal.4th 934, 129 Cal.Rptr.2d 828, 62 P.3d 69 (2003); and (3) the changes in corporate ownership should not hinder plaintiffs' ability to recover damages. *Class v. Am. Roller Die Corp.*, 294 N.J.Super. 407, 683 A.2d 595, 611 (Law Div. 1996), *rev'd on other grounds*, 308 N.J.Super. 47, 705 A.2d 390 (App.Div.1998) (citation omitted).

I would reaffirm this rule, because it is fair to both general creditors and insurance companies. Transfer of insurance policies by operation of law where (1) the incident creating the liability occurred during the effective period of the insurance policy and (2) the successor corporation falls under at least one criterion set forth in *Evanston Insurance, see supra* at 370–72, 183 P.3d at 747–49, serves the public policy favoring recovery by a plaintiff without increasing the risks facing insurance companies.

### III.

### A.

Under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA),[5] 42 United States Code (U.S.C.) § 9601 *et seq.*, successor liability arises from the statute itself. The section entitled "Liability," 42 U.S.C. § 9607, provides in pertinent part:

(a) Covered persons; scope; recoverable costs and damages; interest rate; "comparable maturity" date

Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section—

(1) *the owner and operator of* a vessel or *a facility,*

(2) *any person who at the time of disposal of any hazardous substance owned or operated any facility* at which such hazardous substances were disposed of,

· · ·

*... shall be liable for—*

(A) *all costs of removal or remedial action* incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan;

(B) *any other necessary costs of response* incurred by any other person consistent with the national contingency plan;

(C) damages for injury to, destruction of, or loss of natural resources, including

---

5. As set forth in *Am. Color & Chem. Corp. v. Tenneco Polymers, Inc.*, 918 F.Supp. 945, 955 (D.S.C.1995),

> CERCLA was enacted for the "protection and preservation of public health...." *Gen. Elec. v. Litton Bus. Sys.*, 715 F.Supp. 949, 961 (W.D.Mo.1989), *aff'd*, 920 F.2d 1415 (8th Cir. 1990). Such statutes are "to be given an extremely liberal construction for the accomplishment of their beneficial objectives." *Id.* at 961. The goal of § 107 is "to induce [private

parties] voluntarily to pursue appropriate environmental response actions...." *Id.* at 962 [ (emphasis omitted) ]. CERCLA was enacted "to encourage ... private cleanup efforts, ... to preserve the limited resources of the government and the Superfund, and to make those responsible bear the burden of the conditions they created." *Con–Tech Sales Defined Benefit Trust v. Cockerham*, [No. 87–5137,], 1991 WL 209791, at *4, 1991 U.S. Dist. LEXIS 14624 (E.D.Pa.1991).

the reasonable costs of assessing such injury, destruction, or loss resulting from such a release; and

(D) the costs of any health assessment or health effects study carried out under section 9604(i) of this title.

(Emphases added.)

In finding liability under CERCLA, the federal courts have held that the four traditional common law exceptions to the general rule of successor non-liability discussed above are applicable. *See, e.g., Atchison, Topeka, & Santa Fe Ry. Co. v. Brown & Bryant, Inc.*, 159 F.3d 358, 361 (9th Cir. 1997), *aff'd in part, rev'd in part on other grounds by United States v. Burlington N. & Santa Fe Ry.*, 502 F.3d 781 (9th Cir.2007) (reaffirming rule that "assets purchasers are not liable as successor corporations unless" one of the four traditional exceptions applies (citing *Louisiana–Pac. Corp. v. Asarco, Inc.*, 909 F.2d 1260, 1263 (9th Cir.1990))); *Cal. Dep't of Toxic Substances Control v. Cal.-Fresno Inv. Co.*, No. CV F 06–0488 LJO SMS, 2007 WL 1345580 at *4, 2007 U.S. Dist. LEXIS 37314 at *12 (E.D.Cal.2007) (noting that "CERCLA authorizes successor liability, and asset purchasers are not liable as successor corporations unless" one of the four traditional exceptions applies) (citations omitted).

## B.

CERCLA does not address whether insurance coverage follows liability by operation of law and several courts have refrained from finding that insurance policies transfer by operation of law in such cases. *See Century Indem. Co. v. Aero-Motive Co.*, 318 F.Supp.2d 530, 539 (W.D.Mich.2003), *aff'd*, 155 Fed.Appx. 833 (6th Cir.2005) (rejecting the operation of law theory because "the relationship between an insurer and an insured is determined under contract principles" and "the successor's liability in a case such as this did not exist at the time of the

asset sale, but rather was imposed years later when CERCLA was enacted"); *Quemetco Inc. v. Pac. Auto. Ins. Co.*, 24 Cal. App.4th 494, 29 Cal.Rptr.2d 627, 632 (1994) (holding that the predecessor's insurance policies were not transferred to the successor because such an assignment, without consent, would leave the predecessor "without any insurance to cover any potential liability assessed against it" under CERCLA and because the predecessor was still "entitled to a defense and may have a defense to the claim of indemnity" in a CERCLA enforcement action); *Liberty Mut. Ins. Co. v. Black & Decker Corp.*, No. 96–10804–DPW, 2003 U.S. Dist. LEXIS 25397 at *18–19 (D.Mass.2003) (construing Massachusetts's equivalent of CERCLA and concluding that "the duty to defend [is not] triggered simply because an entity that acquired property formerly owned or used by an insured has since been sued as a 'successor' to earlier parties (i.e., the insured) that were responsible for depositing waste"); *Red Arrow*, 607 N.W.2d at 302–03 (concluding that "the policy reasons that bolster rules of strict liability and product-line successor liability do not support their application" in CERCLA cases).[6] The reluctance to do so has been grounded on various considerations.

First, several courts have given great weight to timing, *i.e.*, whether CERCLA was in effect when the policies were issued such that the insurer could have considered potential risks under CERLCA. *See, e.g., Atlanta Gas*, 2005 WL 5660476, *18, 2005 U.S. Dist. LEXIS 43592 at *60 (explaining that its conclusion that there was no transfer by operation of law was "extremely influen[ced]" by the fact that "successor liability in a case such as this CERCLA action did not exist at the time of the asset sale, but rather was imposed decades later with the drafting of [CERCLA]" (citations omitted)); *Century Indem.*, 318 F.Supp.2d at 539 (declining to follow *Northern Insurance* in a CERCLA

---

**6.** Other courts have reached the opposite conclusion. *See B.S.B. Diversified*, 947 F.Supp. at 1481–82 (holding that "[i]f the law holds the successor liable for its predecessor's tortious acts—no matter the nature of those acts—then the law likewise transfers the insurance benefits covering liability for those acts to the successor")

(quoting *Quemetco*, 29 Cal.Rptr.2d at 634–35 (Johnson, J., dissenting)); *Gopher Oil*, 588 N.W.2d at 761 (affirming lower court's finding that successor's environmental clean up costs were covered under predecessor's insurance policy).

case because, *inter alia*, "the successor's liability in a case such as this did not exist at the time of the asset sale, but rather was imposed years later when CERCLA was enacted").

This first consideration is a factor in this case considering that the policies issued to DMC by Fireman's Fund, London Market Insurers, Commercial Union, American Re-Insurance, National Continental, and Lexington Insurance Company all expired before CERCLA went into effect. *See* majority opinion at 361, 183 P.3d at 738 n. 5. Fire-

man's Fund argues that "[i]f an assignment is upheld, Fireman's Fund's risks have been increased by the corporate transactions that occurred, all of them after termination of the Fireman's Fund policies." (Emphases and internal quotation marks omitted.) It cannot be fairly said that these insurers considered CERCLA risks when determining whether to insure DMC and at what rates.[7]

Second, because of the nature of CERCLA enforcement, the fact that the successor corporation is liable for clean up costs does not

---

7. The majority implies that too much weight is given to the timing factor in this concurrence. *See* majority opinion at 368, 183 P.3d at 745 n. 14. According to the majority, this opinion "assumes that liability could not be imposed under similar circumstances prior to the enactment of CERCLA." *Id.* That is not so. Nothing in this opinion disputes that DMC, the named insured, could be held liable for contamination caused by its actions while it owned the subject property. However, while DMC might have been held subject to liability under other paradigms, *e.g.*, negligence or nuisance, CERCLA introduced an entirely new risk—strict liability. *See United States v. Atl. Research Corp.*, — U.S. —, —, 127 S.Ct. 2331, 2336, 168 L.Ed.2d 28 (2007) (noting that "CERCLA § 9607 is a strict liability statute" (quoting *United States v. Alcan Aluminum Corp.*, 315 F.3d 179, 184 (2d Cir.2003) (internal quotation marks omitted))). I note that CERCLA actions present the risk of joint and several strict liability, *see* 42 U.S.C. § 9607, which differ in nature from the risks of loss presented by environmental contamination before its passage. Thus, the timing factor is a relevant consideration in whether to exercise equitable power to effect a transfer of insurance benefits by operation of law.

Further, although the majority contends that "the more germane consideration is whether an insurable loss existed," majority opinion at 368, 183 P.3d at 745 n. 14, this concurrence expressly stated that the issue of whether the loss was covered is not implicated in the instant appeal. *See infra* note 9. However, it may be noted that the only issue in *Minnesota Mining & Mfg. Co. v. Traveler's Indemnity Co.*, 457 N.W.2d 175, 177–78 (Minn.1990), cited by the majority, was limited to whether the claimed losses were covered inasmuch as the claimants were named insureds. Thus, the Minnesota Supreme Court's conclusion that the nature of the liability, environmental contamination, was more important than the vehicle by which the liability was imposed, CERCLA and its Minnesota counterpart, is inapposite to this case. Furthermore, the majority's reliance on the pronouncement in *Gopher Oil* that "[a] loss occurs at the time of the contamination, even if the claim is brought under the subsequently enacted legislation[,]" majority opinion

at 368, 183 P.3d at 745 n. 14 (quoting *Gopher Oil*, 588 N.W.2d at 764), is misplaced. That conclusion was a rejection of the insurer's assertion that "because the claims ... are based on CERCLA and [its state counterpart], no loss could have occurred until these laws were enacted." *Gopher Oil*, 588 N.W.2d at 764 (citation omitted). The majority apparently misunderstands this concurrence's consideration of the timing factor to be analogous to that position, which it is not.

The question before this court is whether the insurers who issued policies to DMC should be compelled to provide benefits to DMF in an action arising under CERCLA. Under the circumstances of this case, the pertinent issue is not *what* is covered by the policy, but *who* is covered. For insurers whose policies expired before CERCLA was enacted, to *whom* they anticipated providing benefits is likely to be different than insurers who issued policies after CERCLA was enacted. The latter would be on notice that all of the named insured's successors could be held strictly liable for contamination caused by the predecessor corporation, whereas the former were not.

The majority also points out that the timing factor is not relevant to the two insurers whose policies were in effect after CERCLA was enacted, namely American Home and Motor Vehicle. Majority opinion at 368, 183 P.3d at 745 n.14. But, as clearly indicated *supra* at 375, 183 P.3d at 752, this opinion did not consider the timing of CERCLA's passage as relevant to those insurers.

The majority finally opines that its application of "HRS §§ 431:10–237 and 431:10–228(a) ... to the facts and circumstances presented in this case[ ]" resolves the issue of who is covered under the insurance policies, thus eliminating the need for any inquiry into what is covered under the policies. Majority opinion at 368, 183 P.3d at 745 n.14. With all due respect, as pointed out *supra* at 370–71, 183 P.3d at 747–48, this position disregards the distinction between express transfers of insurance benefits and transfer by operation of law, specifically that transfers by operation of law may be in derogation of the terms of the policies themselves.

preclude liability on the part of the predecessor corporation. *Red Arrow*, 607 N.W.2d at 302 (noting that "the EPA sought recovery from [the successor] *and* [the predecessor] for CERCLA response costs") (emphasis added). Fireman's Fund raises this point in its brief, noting that both CPC and DMC,[8] "the entities to which Fireman's Fund issued the relevant policies, remain potentially liable for damages arising out of the Kunia plantation contamination." It emphasizes the fact that "the currently constituted [DMC] remains a corporation separate and apart from [DMF], and still remains at risk to the EPA if [DMF] does not investigate and remediate the Kunia site." (Internal citations omitted.) Fireman's Fund further avers that it has "accepted tenders of the EPA claim"[9] and two other related actions "from both [DMC] and [DMF], under reservation of rights." (Internal citations and emphasis omitted.)[10]

### C.

Such considerations would appear relevant in the instant case. First, policy considerations that support transferring insurance policies by operation of law in the products liability arena, such as fairness to injured consumers, *see Class*, 683 A.2d at 611; *Decius*, 105 P.3d at 960, are inapplicable in CERCLA cases. Here, the injured party is not an innocent consumer but the successor corporation. It is in privity of contract with the predecessor corporation, and could have

protected itself from the damages arising from the contamination. Notably, in this case, the successor chose not to do so, and in fact, relieved the predecessor of responsibility for liability related to groundwater contamination.[11]

Second, unlike in products liability cases, the predecessor corporation is not relieved of liability under CERCLA simply because it no longer owns the contaminated site. Because the predecessor corporation may still be liable, so too might its insurance carriers. Thus, the declaration in *Northern Insurance*, 955 F.2d at 1358, that if an insurer is required to cover a successor for "pre-sale activit[ies,]" "the insurer still covers only the risk it evaluated when it wrote the policy[,]" is inapplicable under the particular circumstances of the instant case.[12] A rule enforcing the transfer of insurance policies by operation of law in some CERCLA cases such as the instant one would force insurers to assume responsibility for more than what they bargained for when they agreed to insure only the predecessor. As Fireman's Fund maintains, its "insurance contracts with CPC and [DMC] did not contemplate that Fireman's Fund would have to pay the defense costs of two (or more) entities, allegedly liable for the same loss, resulting from the operations of CPC or [DMC] at the Kunia plantation." (Emphasis omitted.)

### IV.

Under the particular circumstances of this case, I would hold that the benefits of DMC's

---

8. CPC and DMC are DMF's predecessors.

9. There may be issues, not presently before this court, as to whether the insurance policies cover the CERCLA action. Those issues would, of course, be resolved by interpreting the language of the policies themselves pursuant to the precepts set forth in *Dairy Road*, 92 Hawai'i at 411–12, 992 P.2d at 106–07 (citations omitted), that insurance policies are "subject to the general rules of contract construction" but "must be construed liberally in favor of the insured and any ambiguities must be resolved against the insurer."

10. The court in *Red Arrow* articulated, without elaboration or authority, a third rationale, namely, that "the need to spread the costs associated with environmental cleanup has not risen to the same level of public concern as the need to protect otherwise defenseless victims from manufacturing defects." *Red Arrow*, 607 N.W.2d at

302. In light of the lack of support for this proposition, I doubt it is a persuasive one.

11. Specifically, in the Assumption Agreement, DMF agreed to "undertake[ ], assume[ ], and ... perform, pay or discharge when due ... all liabilities and obligations arising out of and relating to the operations of [DMC's] Hawaiian Business, *including, without limitation, any and all contingent liabilities related to the contamination of ground water* or the use of heptachlor[.]" (Emphasis added.)

12. *Total Waste Management* and *Gopher Oil*, which allowed for transfer of insurance benefits by operation of law in environmental contamination cases, were premised on the rationale that allowing for the transfer by operation of law would not impose a greater risk on the insurers. *See Total Waste Mgmt.*, 857 F.Supp. at 152; *Gopher Oil*, 588 N.W.2d at 763. This rationale is inapplicable under the facts of the present case.

insurance policies were not transferred to DMF by contract or by operation of law.